# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MSP RECOVERY CLAIMS, SERIES, LLC, a Delaware entity, MAO-MSO RECOVERY, LLC, a Delaware entity, MSPA CLAIMS 1, LLC, a Florida entity, MAO-MSO RECOVERY II, LLC, a Delaware entity, | § § § § § § § | Case No. |
| Plaintiffs, | § § | DEMAND FOR JURY TRIAL |
| v. | § § | CLASS ACTION COMPLAINT |
| WARNER CHILCOTT PLC, WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US), LLC, WARNER CHILCOTT SALES (U.S.) LLC, ACTAVIS PLC, ACTAVIS PHARMA, INC., ALLERGAN PLC, and JOHN DOES #1-100, FICTICIOUS NAMES | § § § § § § § § § § | |
| Defendants. | § | |

# Contents

INTRODUCTION ................................................................................................................ 3

PARTIES ........................................................................................................................... 4

JURISDICTION AND VENUE ......................................................................................... 8

STANDING ....................................................................................................................... 9

STATUTORY FRAMEWORK FOR FRAUD COMMITTED BY DEFENDANTS ............... 59

    The Social Security Act & Medicare ........................................................................... 59

        The Medicare Part C Program ................................................................................. 60

        Plaintiffs' Assignors ................................................................................................ 62

        The Medicare Part D Program ................................................................................. 62

    The FDA Regulatory System ....................................................................................... 64

        The Key Components of Drug Labeling and Marketing ............................................. 65

        Drug Samples and Coupon Abuses, Accurate Reporting by Providers ...................... 68

    The Anti-Kickback Statute .......................................................................................... 69

FACTUAL ALLEGATIONS .............................................................................................. 72

    The Federal Charges Admitted to by Defendants ........................................................ 72

        Scheme 1 - The Kickbacks Affecting All Warner Chilcott Products. ......................... 72

        Scheme 2 – Manipulation of Prior Authorizations for Atevia and Actonel ................ 90

        Scheme 3 - Unlawful Promotion of Actonel as "Clinically Superior" to Generics ..... 99

    Factual Summary ........................................................................................................ 110

        Warner Chilcott Conspired with High-Prescribing Health Care Professionals .......... 111

        The Qui Tam Case .................................................................................................. 113

        The Criminal Health Care Fraud Case ..................................................................... 113

TOLLING OF THE STATUTE OF LIMITATIONS ......................................................... 114

    DISCOVERY RULE TOLLING .................................................................................. 114

    FRAUDULENT CONCEALMENT TOLLING ............................................................ 115

    ESTOPPEL ................................................................................................................. 115

CLASS ALLEGATIONS .................................................................................................. 115

CLAIMS FOR RELIEF .................................................................................................... 119

    VIOLATIONS OF 18 U.S.C. § 1962(C) AND (D) ...................................................... 119

    VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ................................. 129

    COMMON LAW FRAUD .......................................................................................... 151

    UNJUST ENRICHMENT ........................................................................................... 154

DEMAND FOR JUDGMENT .......................................................................................... 155

JURY DEMAND ............................................................................................................. 155

## COMPLAINT

Plaintiffs, MSP Recovery Claims, Series LLC, a Delaware entity, MSPA Claims 1, LLC, a Florida entity, MAO-MSO Recovery, LLC, a Delaware entity, and MAO-MSO Recovery II, LLC, a Delaware entity (collectively "Plaintiffs"), bring this action against Defendants Warner Chilcott PLC, Warner Chilcott Corporation, Warner Chilcott (US), LLC, (collectively "Warner Chilcott), Actavis Pharma, Inc., Allergan PLC, and John Does #1-100 (all collectively "Defendants"), to redress Plaintiffs' injuries due to Defendants' false or fraudulent acts constituting patterns of racketeering, which have caused Plaintiffs to provide payment for medical expenses that would have otherwise been denied, causing substantial benefit of the Defendants. Plaintiffs' allegations, proof and statistical data presented in this complaint are based on their own experiences and personal knowledge, their research, the research of their counsel, publicly available articles, studies, and reports, as well as other sources.

## INTRODUCTION

In approximately April 2016, Warner Chilcott entered a plea of guilty to one charge of healthcare fraud against the government and its Medicare program in the United States Federal Court for the District of Massachusetts.  (*See* Transcript of Plea Proceedings, Case No. 1:15-cr-10327 (D. Mass. Apr. 15, 2016))[1].  The criminal plea came about in concert with a False Claims Act civil suit brought in 2011 by insider whisteblowers agaisnt Warner Chilcottt that was unsealed on January 3, 2013.  (*See generally* Docket, Case No. 1:11-cv-10545 (D. Mass.)).  Warner Chilcott's guilty plea admitted to a scheme of fraud comprised of three general patterns of conduct:  1) the fraudulent use of "Medical Education" speaker events ("MedEd events") to pump up prescriptions from doctors of its entire line of prescription drugs and engage in illegal

---

[1] Transcript of Plea Proceedings attached as "Exhibit A".

kickbacks; 2) the fraudulent use of a "Prior Authorization" scheme to pump up prescriptions for its osteoporosis drug Atelvia; and 3) the fraudulent use of false efficacy claims and studies to pump up prescriptions for another osteoporosis drug, Actonel.  The other drugs intertwined with the Warner Chilcott's fraudulent MedEd events were Asacol (400 mg), Asacol HD, Doryx, Enablex, Estrace Cream, Loestrin, and Lo Loestrin (collectively the "Warner Products"). These fraudulent practices illegally induced health care professionals to prescribe, and patients to use, its drug products, to the detriment and injury of Plaintiffs and the underlying Medicare Advantage Organizations ("MAOs") that assigned their claims to Plaintiffs.

These actions along with the submission of bills for payment for Warner Chillcott's products[2] constitute predicate acts for the basis of Plaintiffs' Racketeering Influenced Corrupt Organization ("RICO") claims.

## PARTIES

### *Plaintiffs*

1.      MSP Recovery Claims, Series LLC, is a Delaware entity with its principal place of business located at 5000 S.W. 75th Avenue, Suite 400, Miami, FL 33155. Numerous MAOs across the United States have assigned their rights to MSP Recovery Claims, Series LLC, to recover payments for fraudulently-submitted prescriptions. As a result of these assignments, MSP Recovery Claims, Series LLC, is empowered and has standing herein to pursue the claims of its Assignors that purchased Warner Products as a result of the Defendants' pattern of racketeering activity.   Accordingly, Plaintiffs, MSP Recovery Claims, Series LLC, by assignment, has suffered damages and now seeks reimbursement for the money lost by these MAOs that were forced to pay for fraudulently submitted Warner Products.

---

[2] Attached as "Exhibit B" are claims Plaintiff's Assignors paid for Warner Chilcott products.

2.      Plaintiff MSPA Claims 1, LLC is a Florida entity, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, FL 33134.  MSPA Claims 1 is a citizen of the State of Florida and is not a citizen of the state of any of the Defendants. Numerous MAOs across the United States have assigned their rights to MSPA Claims 1, LLC, to recover payments for fraudulently-submitted prescriptions. As a result of these assignments, MSPA Claims 1, LLC, is empowered and has standing herein to pursue the claims of its Assignors that purchased Warner Products as a result of the Defendants' pattern of racketeering activity.  Accordingly, Plaintiff, MSPA Claims 1, LLC, by assignment, has suffered damages and now seeks reimbursement for the money lost by these MAOs that were forced to pay for fraudulently submitted Warner Products.

3.      Plaintiff, MAO-MSO Recovery, LLC, is a Delaware entity with its principal place of business at 5000 S.W. 75th Avenue, Miami, FL 33155. Numerous MAOs across the United States have assigned their rights to MAO-MSO Recovery, LLC, to recover payments for fraudulently-submitted prescriptions. As a result of these assignments, MAO-MSO Recovery, LLC, is empowered and has standing herein to pursue the claims of its Assignors that purchased Warner Products as a result of the Defendants' pattern of racketeering activity.  Accordingly, Plaintiff, MAO-MSO Recovery, LLC, by assignment, has suffered damages and now seeks reimbursement for the money lost by these MAOs that were forced to pay for fraudulently submitted Warner Products.

4.      Plaintiff, MAO-MSO Recovery II, LLC, is a Delaware entity with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626. Numerous MAOs across the United States have assigned their rights to MAO-MSO Recovery II, LLC, to recover payments for fraudulently-inflated prescriptions. As a result of these assignments, MAO-MSO Recovery II,

LLC, is empowered and has standing herein to pursue the claims of its Assignors that purchased Warner Products as a result of the Defendants' pattern of racketeering activity. Accordingly, Plaintiff, MAO-MSO Recovery II, LLC, by assignment, has suffered damages and now seeks reimbursement for the money lost by these MAOs that were forced to pay for fraudulently submitted Warner Products.

5.      Plaintiffs paid Medicare benefits on behalf of the Medicare-eligible beneficiaries enrolled under the Medicare Advantage ("MA") program. MAOs and/or their Assignees paid or otherwise incurred losses for Warner Products through Defendants' racketeering and unlawful practice(s).

*Defendants*

6.      At times material to this Complaint, Defendant Warner Chilcott plc is/was a publicly traded, for-profit Company organized, existing, and doing business under the laws of Ireland, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129. Through its direct and indirect subsidiaries, Warner Chilcott plc is/was engaged in the discovery, development, manufacturing, marketing and distribution of pharmaceutical products including the Warner Products. On October 1, 2013, Warner Chilcott plc was acquired by Actavis plc, which later renamed itself Allergan plc, after Actavis' purchase of Allergan, Inc.

7.      At times material to this Complaint, Warner Chilcott Corporation is/was a wholly-owned, indirect subsidiary of Warner Chilcott plc and is the direct 100% shareholder of Warner Chilcott (US), LLC. Warner Chilcott Corporation is organized, exists, and does business under the laws of the State of Delaware, with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

8.      At times material to this Complaint, Warner Chilcott (US), LLC is/was a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (US), LLC is organized, exists, and does business under the laws of the State of Delaware, with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

9.      At time material to this Complaint, Warner Chilcott Sales (US), LLC is/was a wholly owned subsidiary of Warner Chilcott Corporation. Warner Chilcott Sales (US), LLC is organized exists and does business under the laws of the State of Delaware with a principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129. Warner Chilcott Sales (US), LLC can be served through its Resident Agent: RT Corporation System, 155 Federal St., Suite 700, Boston, MA 02110.

10.     Actavis plc is publicly traded, for-profit Company organized, existing, and doing business under the laws of Ireland, that acquired Warner Chilcott plc and its subsidiaries in 2013, and later acquired a separate U.S. corporation, Allergan, Inc. in 2014.   In 2015, Actavis plc renamed itself Allergan plc.   Its principle place of business in the United States is at 400 Interpace Parkway, Parisppany, NJ 07054

11.     Allergan plc continues as a publicly traded, for profit Company organized, existing, and doing business under the laws of Ireland, with a principle place of business in the United States at 400 Interpace Parkway, Parisppany, NJ 07054.

12.     The term "Warner Chilcott" when used in this Complaint shall mean the collection of both the parent and its subsidiary companies and executives and agents thereof, acting in concert with the company directive and policies therein.

13.     In North America, Warner Chilcott's product line focuses on gastroenterology, women's healthcare, dermatology, and urology pharmaceutical markets. Warner Chilcott has an

expanded sales force and infrastructure promoting its products throughout the United States, including in this judicial district.

14.     John Does #1-100, fictitious names, are unnamed health care professionals, individuals, corporations, limited liability companies, or other lawful business entities through which Defendants do business in the United States and internationally, and who are known or unknown co-conspirators who conspired with Warner Chilcott to perpetuate the schemes described herein.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) as this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

16.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district. 15 U.S.C. § 22 provides for nationwide service of process.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to the complaint took place within this district. Venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2), because Defendants reside or may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District

pursuant to 18 U.S.C. § 1965, because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court. Venue is also proper in this District pursuant to 15 U.S.C. § 22 because most Defendants inhabit, are found, have an agent, or transact business in this District.

## STANDING

18.     Plaintiff has been assigned all legal rights of recovery and reimbursement for health care services and Medicare benefits provided by MAOs, HMOs, MSOs, and IPAs (collectively, the "Assignors"), that administer Medicare benefits for Medicare beneficiaries under Medicare Part C and/or Medicare Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

19.     All of these assignments are valid and binding contracts and are alleged in some detail below.

20.     On 9/21/2015, 7th Avenue Medical Plaza, Inc. entered into an assignment with MSP Recovery 15-473, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.

The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-473, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from 7th Avenue Medical Plaza, Inc.  This assignment was made pursuant to the Series 15-09-32 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

21.     On 12/10/2015, Alianza Profesional de Cuidado Medico, Inc. entered into an agreement with MSP Recovery 15-627, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-627, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Alianza Profesional de Cuidado Medico, Inc.  This assignment was made pursuant to the Series 15-12-404 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

22.     On 8/12/2015, America's 1st Choice Health Plans, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from America's 1st Choice Health Plans, Inc.  This assignment was made pursuant to the Series 15-08-16 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

23.     On 8/12/2015, America's 1st Choice of South Carolina, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its

right to recover   payments   as assigned from America's 1st Choice of South Carolina, Inc.  This assignment was made pursuant to the Series 15-08-16 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

24.      On 12/16/2015, Arse, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments assigned from Arse, Inc.  This assignment was made pursuant to the Series 15-12-406 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

25.      On 3/1/2016, Asomante Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Asomante Medical Group, Inc.  This assignment was made pursuant to the Series 16-03-444 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

26.       On 2/26/2016, Asociacion Medico Selecto de la Montana, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover as assigned from Asociacion Medico Selecto de la Montana, Inc.  This assignment was made pursuant to the Series 16-03-441 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

27.     On 2/18/2016, Broward Primary Partners, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Broward Primary Partners, LLC.  This assignment was made pursuant to the Series 16-02-437 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

28.     On 2/4/2016, Canovanas Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover

payments as assigned from Canovanas Medical Group, Inc.  This assignment was made pursuant

to the Series 16-02-427 agreement. This second assignment contract was executed by individuals

of majority, of sound mind, and with legal authority to bind the respective parties.  This second

assignment was entered into under Delaware law.  Consideration was given between each party

in executing these assignments.

29.     On 1/19/2017, Ortho Miami (CE Ceballos MD LLC) entered into an agreement

with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby

irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its

successors and assigns, any and all of Client's right, title, ownership and interest in and to all

Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and

all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client

that Client had, may have had, or has asserted against any party in connection with the Claims

and all rights and claims against primary payers and/or third parties that may be liable to client

arising from or relating to the Claims, including claims under consumer protection statutes and

laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."

The assignment contract was executed by individuals of majority, of sound mind, and with legal

authority to bind the respective parties.  The assignment was entered into under Florida law0  On

6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series

LLC, irrevocably assigning its right to recover payments as assigned from Ortho Miami (CE

Ceballos MD LLC)."  This assignment was made pursuant to the Series 17-03-584 agreement.

This second assignment contract was executed by individuals of majority, of sound mind, and

with legal authority to bind the respective parties.  This second assignment was entered into

under Delaware law.  Consideration was given between each party in executing these assignments.

30.     On 5/2/2016, Centro Ceski, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Centro Ceski. This assignment was made pursuant to the Series 16-02-445 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

31.     On 2/22/2016, Centro Medico de Salinas, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments assigned from Centro Medico de Salinas, Inc.  This assignment was made pursuant to the Series 16-02-438 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

32.     On 11/23/2015, Century HealthCare, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Century HealthCare, Inc.  This assignment was made pursuant to the Series 15-08-24 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second

assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

33.     On 12/16/2015, Corporacion Medica Oriental, Corp. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Corporacion Medica Oriental, Corp.  This assignment was made pursuant to the Series 15-12-407 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

34.     On 3/31/2016, Corporacion Puertorriquena de Salud, Inc. (CPS) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the

Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Corporacion Puertorriquena de Salud, Inc. (CPS)." This assignment was made pursuant to the Series 16-04-448 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

35.     On 11/23/2015, Doctor's Group Management, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Doctor's Group Management, Inc. This assignment was made pursuant to the Series 15-08-26 agreement. This second assignment contract was executed

by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

36.     On 8/14/2015, Family Medicine Group, Inc. entered into an agreement with MSP Recovery 15-222, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-522, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Family Medicine Group, Inc.  This assignment was made pursuant to the Series 15-09-281 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

37.     On 6/19/2017, Fallon Community Health Plan, Inc. entered into an agreement with MSP Recovery LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client

that Client had, may have had, or has asserted against any party in connection with the Claims

and all rights and claims against primary payers and/or third parties that may be liable to client

arising from or relating to the Claims, including claims under consumer protection statutes and

laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."

The assignment contract was executed by individuals of majority, of sound mind, and with legal

authority to bind the respective parties.  The assignment was entered into under Massachusetts

law.  On 6/20/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims,

Series LLC, irrevocably assigning its right to recover payments as assigned from Fallon

Community Health Plan, Inc.  This assignment was made pursuant to the Series 17-04-631

agreement. This second assignment contract was executed by individuals of majority, of sound

mind, and with legal authority to bind the respective parties.  This second assignment was

entered into under Delaware law.  Consideration was given between each party in executing

these assignments.

      38.     On 10/9/2015, Farid Marquez, MD, PA entered into an agreement with MSP

Recovery 529, LLC. Said assignment included the following language "[c]lient hereby assigns,

transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used

to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")." The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Florida law.  On 6/12/2017, MSP Recovery 529, LLC entered into an

agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover

payments as assigned from Farid Marquez, MD, PA.  This assignment was made pursuant to the

Series 15-09-284 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

39.     On 2/26/2016, First Medical Center, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from First Medical Center, Inc.  This assignment was made pursuant to the Series 16-03-442 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

40.     On 8/12/2015, Foothill Accountable Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or

has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Foothill Accountable Medical Group, Inc.  This assignment was made pursuant to the Series 15-08-15 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

41.     On 8/12/2015, Freedom Health, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Freedom Health, Inc.  This assignment was made pursuant to the Series 15-08-16 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

42.     On 12/10/2015, Grupo de Cuidado Medico Integral, Inc. entered into an agreement with MSP Recovery 15-626, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery 15-626, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo de Cuidado Medico Integral, Inc. This assignment was made pursuant to the Series 15-12-403 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

43.     On 2/4/2016, Grupo Medico Aliado Del Noreste, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to

recover payments as assigned from Grupo Medico Aliado Del Noreste, Inc.  This assignment was made pursuant to the Series 16-02-433 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

44.      On 2/2/2015, Grupo Medico del Noreste, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo Medico del Noreste, Inc.  This assignment was made pursuant to the Series 16-02-429 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

45.      On 2/4/2016, Grupo Medico del Yunque, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used

to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo Medico del Yunque, Inc.  This assignment was made pursuant to the Series 16-02-428 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

46.     On 4/28/2016, Health First Administrative Plans, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series

LLC, irrevocably assigning its right to recover payments as assigned from Health First Administrative Plans, Inc.  This assignment was made pursuant to the Series 16-05-456 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

47.     On 8/28/2015, Healthcare Advisors Services, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Healthcare Advisors Services, Inc.  This assignment was made pursuant to the Series 15-08-27 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

48.     On 10/8/2015, Healthcare Alliance Group, Inc. entered into an agreement with MSP Recovery 15-475, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of

Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-475, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Healthcare Alliance Group, Inc.  This assignment was made pursuant to the Series 15-09-273 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

49.      On 9/14/2015, Hygea Health Holdings, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Hyega Health Holdings, Inc.  This assignment was made pursuant to the Series 15-08-19 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second

assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

50.     On 8/11/2015, Intervalley Health Plan, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Intervalley Health Plan, Inc.  This assignment was made pursuant to the Series 15-09-242 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

51.     On 12/10/2015, MCA Health Group, LLC entered into an agreement with MSP Recovery 15-625, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.

The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-625, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from MCA Health Group, LLC.  This assignment was made pursuant to the Series 15-12-402 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

52.      On 12/10/2015, Medico-Caribe CSP, Inc. entered into an agreement with MSP Recovery 15-623, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-623, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Medico-Caribe CSP, Inc. (medico)."  This assignment was made pursuant to the Series 15-12-400 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

53.      On 2/18/2016, Medical IPA of the Palm Beaches, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby

assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Medical IPA of the Palm Beaches, Inc.  This assignment was made pursuant to the Series 16-02-436 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

54.     On 12/10/2015, Metro Medical Health Group, Inc. entered into an agreement with MSP Recovery 15-622, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-622, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Metro Medical Health Group, Inc.  This assignment was made pursuant to the Series 15-12-399 agreement.  This second assignment

contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

55. On 2/28/2017, Miami Institute for Joint Reconstruction (Arturo Corces, MD PA) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Miami Institute for Joint Reconstruction (Arturo Corces, MD PA)." This assignment was made pursuant to the Series 17-02-565 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

56.     On 12/10/2015, Millennium Medical, Inc. entered into an agreement with MSP Recovery 15-621, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-621, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Millennium Medical, Inc.  This assignment was made pursuant to the Series 15-12-398 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

57.     On 6/12/2017, MMM Holdings, LLC entered into an agreement with MSP Recovery, LLC Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall

constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/20/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments   as assigned from MMM Holdings, LLC.  This assignment was made pursuant to the Series 17-02-554 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

58.      On 12/10/2015, Opcion MCA, Inc. entered into an agreement with MSP Recovery 15-624, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-624, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Opcion MCA, Inc.  This assignment was made pursuant to the Series 15-12-401 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

59.     On 8/12/2015, Optimum Healthcare and Affiliates, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Optimum Healthcare and Affiliates, Inc.  This assignment was made pursuant to the Series 15-08-14 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

60.     On 11/8/2016, OrthoNow, LLC (Doral) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all

information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from OrthoNow, LLC (Doral)." This assignment was made pursuant to the Series 16-11-524 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

61.     On 12/23/2015, Palm Beach Primary Care Associates, Inc. entered into an agreement with MSP Recovery 16-1, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 16-1, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Palm Beach Primary Care Associates, Inc.  This assignment was made pursuant to the Series 16-01-409 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

62.      On 10/29/2015, Physician Access Urgent Care Group, LLC (PAUG) entered into an agreement with MSP Recovery 15-580, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-580, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Physician Access Urgent Care Group, LLC (PAUG)."  This assignment was made pursuant to the Series 15-10-362 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

63.      On 10/9/2015, PDP Health Management, Inc. entered into an agreement with MSP Recovery 15-333, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-333,

LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning

its right to recover   payments   as assigned from PDP Health Management, Inc.  This assignment

was made pursuant to the Series 15-09-293 agreement. This second assignment contract was

executed by individuals of majority, of sound mind, and with legal authority to bind the

respective parties.  This second assignment was entered into under Delaware law.  Consideration

was given between each party in executing these assignments.

      64.     On 12/3/2015, Physicians HMO (IPA 951) entered into an agreement with MSP

Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns,

transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used

to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")."   The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an

agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover

payments   as assigned from Physicians HMO (IPA 951).  This assignment was made pursuant to

the Series 15-12-396 agreement.  This second assignment contract was executed by individuals

of majority, of sound mind, and with legal authority to bind the respective parties.  This second

assignment was entered into under Delaware law.  Consideration was given between each party

in executing these assignments.

      65.     On 12/13/2016, Plum Healthcare Group, LLC entered into an agreement with

MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby

irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its

successors and assigns, any and all of Client's right, title, ownership and interest in and to all

Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and

all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client

that Client had, may have had, or has asserted against any party in connection with the Claims

and all rights and claims against primary payers and/or third parties that may be liable to client

arising from or relating to the Claims, including claims under consumer protection statutes and

laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."

The assignment contract was executed by individuals of majority, of sound mind, and with legal

authority to bind the respective parties.  The assignment was entered into under Florida law.   On

6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series

LLC, irrevocably assigning its right to recover   payments   as assigned from Plum Healthcare

Group, LLC.  This assignment was made pursuant to the Series 16-10-504 agreement. This

second assignment contract was executed by individuals of majority, of sound mind, and with

legal authority to bind the respective parties.  This second assignment was entered into under

Delaware law.  Consideration was given between each party in executing these assignments.

66.      On 5/6/2016, Policlinicas Medicas Asociadas, Inc. entered into an agreement

with MSP Recovery, LLC, Said assignment included the following language "[c]lient hereby

assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of

Client's right, title, ownership and interest in and to all rights and entitlements, and all

information used to pursue and/or recover monies for Client that Client has, may have had, or

has asserted against any party ("Assigned Claims")."  The assignment contract was executed by

individuals of majority, of sound mind, and with legal authority to bind the respective parties.

The assignment was entered into under Puerto Rico law.  On 6/12/2017, MSP Recovery, LLC

entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover as assigned from Policlinicas Medicas Asociadas, Inc.  This assignment was made pursuant to the Series 16-05-457 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

67.    On 5/6/2016, Policlinicas Medicas Asociadas, Inc. entered into an agreement with MSP Recovery, LLC, irrevocably assigning its right to recover   payments  . The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Policlinicas Medicas Asociadas, Inc.  This assignment was made pursuant to the Series 16-05-457 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

68.    On 4/16/2016, Ponce Advance Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client

that Client had, may have had, or has asserted against any party in connection with the Claims

and all rights and claims against primary payers and/or third parties that may be liable to client

arising from or relating to the Claims, including claims under consumer protection statutes and

laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."

The assignment contract was executed by individuals of majority, of sound mind, and with legal

authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.

On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims,

Series LLC, irrevocably assigning its right to recover   payments   as assigned from Ponce

Advance Medical Group, Inc.  This assignment was made pursuant to the Series 16-04-454

agreement.  This second assignment contract was executed by individuals of majority, of sound

mind, and with legal authority to bind the respective parties.  This second assignment was

entered into under Delaware law.  Consideration was given between each party in executing

these assignments.

       69.     On 2/18/2016, Preferred Primary Care, LLC entered into an agreement with

MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns,

transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used

to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")."   The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an

agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover

payments   as assigned from Preferred Primary Care, LLC.  This assignment was made pursuant

to the Series 16-02-435 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

70.     On 8/13/2015, Presgar Imaging of CMI North, LLC entered into an agreement with MSP Recovery 200, LLC.  Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 200, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Presgar Imaging of CMI North, LLC.  This assignment was made pursuant to the Series 15-08-21 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

71.     On 1/15/2016, Primary Physicians Medical Services, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[i]n order to pursue the Primary Payors Claims, and as limited to the Primary Payors Claims client hereby assigns, transfers, conveys, sets over and delivers to MSP or its Assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all

information and data used to pursue and/or recover monies for Client that Client has, may have

had, or has asserted against any party (the "Assigned Claims")." This includes, but is not limited

to, primary payors and/or third parties that may be liable to client arising from or relating to the

Assigned Claims.  The assignment contract was executed by individuals of majority, of sound

mind, and with legal authority to bind the respective parties.  The assignment was entered into

under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with

MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as

assigned from Primary Physicians Medical Services, LLC.  This assignment was made pursuant

to the Series 16-01-413 agreement.  This second assignment contract was executed by

individuals of majority, of sound mind, and with legal authority to bind the respective parties.

This second assignment was entered into under Delaware law.  Consideration was given between

each party in executing these assignments.

72.     On 4/20/2015, Primum HealthCare, LLC entered into an agreement with MSP

Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns,

transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used

to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")."   The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an

agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover

payments   as assigned from Primum HealthCare, LLC.  This assignment was made pursuant to

the Series 15-11-384 agreement.  This second assignment contract was executed by individuals

of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

73.    On 10/29/2015, Puerto Rico Performance Medical Group, Inc. entered into an agreement with MSP Recovery, 15-604 LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims").    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, 15-604 LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Puerto Rico Performance Group, Inc. This assignment was made pursuant to the Series 15-11-383 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

74.    On 2/26/2016, Quality Care Physicians, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered into an

agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover

payments   as assigned from Quality Care Physicians, LLC.  This assignment was made pursuant

to the Series 16-03-440 agreement.  This second assignment contract was executed by

individuals of majority, of sound mind, and with legal authority to bind the respective parties.

This second assignment was entered into under Delaware law.  Consideration was given between

each party in executing these assignments.

       75.      On 9/21/2015, Quality Medical Association of West Delray, Inc. entered into an

agreement with MSP Recovery 16-2, LLC. Said assignment included the following language

"[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its

assigns, any and all of Client's right, title, ownership and interest in and to all rights and

entitlements, and all information used to pursue and/or recover monies for Client that Client has,

may have had, or has asserted against any party ("Assigned Claims")."   The assignment

contract was executed by individuals of majority, of sound mind, and with legal authority to bind

the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP

Recovery 16-2, LLC entered into an agreement with MSP Recovery Claims, Series LLC,

irrevocably assigning its right to recover   payments   as assigned from Quality Medical

Association of West Delreay, Inc.  This assignment was made pursuant to the Series 16-01-410

agreement.  This second assignment contract was executed by individuals of majority, of sound

mind, and with legal authority to bind the respective parties.  This second assignment was

entered into under Delaware law.  Consideration was given between each party in executing

these assignments.

76.     On 2/22/2016, Quality Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments   as assigned from Quality Medical Group, Inc.  This assignment was made pursuant to the Series 16-02-439 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

77.     On 2/18/2016, Healthy Partners/Risk Watchers, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to

recover   payments   as assigned from Healthy Partners / Risk Watchers, Inc.  This assignment

was made pursuant to the Series 15-09-31 agreement.  This second assignment contract was

executed by individuals of majority, of sound mind, and with legal authority to bind the

respective parties.  This second assignment was entered into under Delaware law.  Consideration

was given between each party in executing these assignments.

      78.      On 7/26/2016, SE Primary Services, Inc. entered into an agreement with MSP

Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably

assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors

and assigns, any and all of Client's right, title, ownership and interest in and to all Claims

existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights

(including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client

had, may have had, or has asserted against any party in connection with the Claims and all rights

and claims against primary payers and/or third parties that may be liable to client arising from or

relating to the Claims, including claims under consumer protection statutes and laws, and all

information relating thereto, all of which shall constitute the "Assigned Claims"."  The

assignment contract was executed by individuals of majority, of sound mind, and with legal

authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.

On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims,

Series LLC, irrevocably assigning its right to recover   payments   as assigned from SE Primary

Services, Inc.  This assignment was made pursuant to the Series 16-07-481 agreement.  This

second assignment contract was executed by individuals of majority, of sound mind, and with

legal authority to bind the respective parties.  This second assignment was entered into under

Delaware law.  Consideration was given between each party in executing these assignments.

79.     On 1/18/2016, Southern Healthcare Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments   as assigned from Southern Healthcare Group, Inc.   This assignment was made pursuant to the Series 16-01-420 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

80.     On 5/12/2017, SummaCare, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all

information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Ohio law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from SummaCare, Inc. This assignment was made pursuant to the Series 16-11-509 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

81.     On 9/21/2015, Suncoast Medical Network 2, Inc. entered into an agreement with MSP Recovery, 220, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 220, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Suncoast Medical Network 2, Inc.  This assignment was made pursuant to the Series 15-08-10 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

82.     On 11/9/2015, Suncoast Provider Network, Inc. entered into an agreement with MSP Recovery 15-608, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-608, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Suncoast Provider Network, Inc.  This assignment was made pursuant to the Series 15-11-387 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

83.     On 11/3/2015, Transatlantic Healthcare entered into an agreement with MSP Recovery 15-131, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-131, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning

its right to recover  payments  as assigned from Transatlantic Healthcare.  This assignment was made pursuant to the Series 15-11-385 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

84.      On 11/3/2015, Trinity Physicians, LLC entered into an agreement with MSP Recovery 15-592, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-592, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from Trinity Physicians, LLC.  This assignment was made pursuant to the Series 15-11-371 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

85.      On 11/23/2015, University Health Care MSO, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all

information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from University Health Care MSO, Inc.  This assignment was made pursuant to the Series 15-08-25 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

    86.    On 4/7/2016, Verimed IPA, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series

LLC, irrevocably assigning its right to recover   payments   as assigned from Verimed IPA, LLC. This assignment was made pursuant to the Series 15-09-108 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

87.     On 4/28/2015, Choice One Medical Group, LLC entered into an agreement with MSPA Claims II, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims II, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover   payments   as assigned from Choice One Medical Group, LLC.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.  On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Choice One Medical Group, LLC and MSPA Claims II, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

88.     On 6/2/2015, Meridian Health Systems ACO, Corp. (Meridian Holdings) entered into an agreement with MSPA Claims VIII, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims VIII, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover   payments   as assigned from Meridian Holdings.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.  On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Meridian Holdings and MSPA Claims VIII, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

89.     On 5/14/2015, Pasteur Medical Centers entered into an agreement with MSP Claims III, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")."    The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Florida law.   On 1/21/2016, MSP Claims III, LLC entered into an

agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover

payments   as assigned from Pasteur Medical Centers.  This second assignment contract was

executed by individuals of majority, of sound mind, and with legal authority to bind the

respective parties.  This second assignment was entered into under Florida law.  On 1/21/2016,

MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably

assigning its right to recover   payments   as assigned from Pasteur Medical Centers and MSP

Claims III, LLC.  This third assignment contract was executed by individuals of majority, of

sound mind, and with legal authority to bind the respective parties.  This third assignment was

entered into under Florida law.  Consideration was given between each party in executing these

assignments.

90.     On 6/25/2015, Professional Health Choice entered into an agreement with MSP

Claims XI, LLC. Said assignment included the following language "[c]lient hereby assigns,

transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used

to pursue and/or recover monies for Client that Client has, may have had, or has asserted against

any party ("Assigned Claims")."    The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment

was entered into under Florida law.   On 1/21/2016, MSP Claims XI, LLC entered into an

agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover

payments   as assigned from Professional Health Choice.  This second assignment contract was

executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.  On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Professional Health Choice and MSP Claims XI, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

91.     On 6/2/2015, Texas Physicians ACO entered into an agreement with MSPA Claims X, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims X, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover payments   as assigned from Texas Physicians ACO.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.   On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Texas Physicians ACO and MSPA Claims X, LLC.  This third assignment contract was executed by individuals of majority, of

sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

92.      On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 2/20/2015, MSP Recovery, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Interamerican Medical Center Group, LLC (IMC)."  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

93.      On 8/25/2015, MedConnect Solutions, Inc. entered into an agreement with MSPA Claims III. Said assignment included the following language "[c]lient hereby assigns,

transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims III, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover payments   as assigned from MedConnect Solutions, Inc.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.   On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from MedConnect Solutions, Inc. and MSPA Claims III, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

94.     On 4/27/2017, Reliance ACO, LLC entered into an agreement with MSP Recovery Claims, Series LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims

and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law. Consideration was given between each party in executing these assignments.

## STATUTORY FRAMEWORK FOR FRAUD COMMITTED BY DEFENDANTS

### The Social Security Act & Medicare

95.     The Social Security Act became law on August 14, 1935.  Social Security has grown over the years to encompass more individuals and is now "the foundation of economic security for millions of Americans—retirees, disabled persons, and families of retired, disabled or deceased workers. About 163 million Americans pay Social Security taxes and 59 million collect monthly benefits. About one family in four receives income from Social Security." *See* Nat. Academy of Soc. Ins., https://www.nasi.org/learn/socialsecurity/overview (last visited Oct. 27, 2016).  "Nearly 84 percent of all people 65 and older ("Seniors") receive social security." *See* Social Security Primer at 4, https://www.nasi.org/sites/default/files/ research/2016_Social_Security_Primer.pdf (last visited Oct. 27, 2016).

96.     In 1965, Congress amended the Social Security Act to create the Medicare Act under Title XVIII.  The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled.  The Medicare Act consists of five parts — Part A, B, C, D and E.  Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare." *In re Avandia Mktg. Sales Practices and Products Liability Litigation*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).  Part

C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them.  42 U.S.C. §§ 1395w-21-29. Further, Part D provides for prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x and 1395y. MAOs, the assignor organizations underlying this Complaint, operate primarily under Parts C and D.

97.     An enrollee's health coverage with an MAO is strictly construed and regulated by Centers for Medicare and Medicaid Services ("CMS").  So much so that CMS provides detailed templates for MAOs to use when they create documents, including an evidence of coverage that is provided to enrollees.  *See* CMS, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/MarketngModelsStandardDocumentsandEducationalMaterial.htm l (last visited October 27, 2016).

98.     In essence, **Medicare Part C is the functional equivalent of Original Medicare**.  *See* 42 C.F.R. §§ 422.108(f), 422.101; *Honey v. Bayhealth Med. Ctr., Inc.*, 2015 Del. Super. LEXIS 378, at *18 (Del. Super. Ct. July 28, 2015) (holding "an MAO is squarely within the traditional Medicare system").  Thus, fraud committed under Part C (or Part D) against an MAO is akin to fraud against the government and Medicare itself.

### *The Medicare Part C Program*

99.     Since the 1970s, Medicare beneficiaries have had the option to receive their Medicare benefits through private health plans, mainly Health Maintenance Organizations ("HMOs"), as an alternative to the federally administered traditional Medicare programs. Kaiser Family Foundation, http://kff.org/medicare/fact-sheet/medicare-advantage/ (last visited October 26, 2016). The Balanced Budget Act of 1997 named Medicare's managed care program "Medicare+Choice" and the Medicare Modernization Act (MMA) of 2003 renamed it "Medicare

Advantage." *Id., See also Collins v. Wellcare Healthcare Plans, Inc.*, 73 F. Supp. 3d 653, 659 (E.D. La. 2014). "The congressional goal in creating the Medicare Part C option was to harness the power of private sector competition to stimulate experimentation and innovation to create a more efficient and less expensive Medicare system." D. Gary Reed, *Medicare Advantage Misconceptions Abound*, 27 Health Law 1, 3 (2014). Congress sought to achieve this goal by implementing a program wherein the government would pay private health insurers a flat rate per enrollee to administer and provide the same basic benefits received under traditional Medicare. *See Honey v. Bayhealth Med. Ctr., Inc.*, 2015 Del. Super. LEXIS 378, at *7-17 (Del. Super. Ct. July 28, 2015). Pursuant to this framework, an MAO pays providers directly for the care received by Part C enrollees. *Id.* at *10. To the extent that this care exceeds the flat rate received from the government, an MAO assumes the risk and cost. *Id.* In the event that care costs less than the flat rate received, an MAO is permitted to keep the difference as a profit. *Id.*

100. To be approved to be an MAO, a private insurer must enter a bidding process, meeting certain threshold requirements. *Id.* MAOs must also be licensed in each State in which they operate. *Id.* MAOs must offer an "[evidence] of coverage" annually, approved by CMS to enrollees. *Id.* In providing the basic benefits offered to traditional Medicare enrollees, MAOs must abide by national coverage determinations provided by CMS. *Id.* In addition, all coverage disputes between enrollees, and MAOs must go through the traditional Medicare appeals process. *Id.* at *11. The decisions coming out of the Medicare appeals process are, moreover, binding upon an MAO. *Id.*

101. It is the federal government which sets the fixed rate at which MAOs will be remunerated. *Id.* at *12. Likewise, the federal government establishes the basic services that each Part C private insurer participant must provide. *Id.* These private health insurers are,

further, constrained in their ability to deny coverage, limited to the decisions of federally anointed adjudicators.  *Id*.  The discretion permitted to these private insurers is within this federally created framework – not outside or even alongside it.  *Id*. at *12–13.  Under Part C, the contract is between the federal government and the insurer.  *Id*. at *13.

### *Plaintiffs' Assignors*

102.    By way of background, Plaintiffs' Assignors entered into a contract with CMS to provide Medicare benefits in accordance with the Medicare Part C program to Medicare-eligible enrollees and, in return, received a per capita fee from CMS.  *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co*., 2016 U.S. App. LEXIS 14509, at *11 (11th Cir. 2016) ("Under the Medicare Advantage program, a private insurance company, operating as an MAO, administers the provision of Medicare benefits pursuant to a contract with CMS. CMS pays the MAO a fixed fee per enrollee, and the MAO provides at least the same benefits as an enrollee would receive under traditional Medicare.");  *See also* 42 U.S.C. §§ 1395w-22(a), 1395w-23.  **Therefore, the defining factor of a truly private insurance plan, one between insured and an insurer, is lacking.**  *See W. Heritage Ins. Co*., 2016 U.S. App. LEXIS 14509 at *11.

103.    In sum, MAOs are more akin to traditional Medicare, rather than a private health insurance plan.  *Id*. at *16-17 ("There is no such thing as a [M]edicare Advantage insurance policy.").  Medicare Advantage is, instead, a federal program.  *Id*.

### *The Medicare Part D Program*

104.    Medicare Part D coverage is voluntary prescription drug benefits program for Medicare beneficiaries established in 2003. A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

105.    Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private market model, wherein Medicare contracts with private entities, known as Part D "sponsors" to administer prescription drug plans.

106.    The Part D plan sponsor must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

107.    A Plan D sponsor submits a bid in the year prior to the calendar year in which Part D benefits will actually be delivered. The bid contains a per member per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

108.    If the Plan D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium. CMS then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

### *An Example of How Defendants' Fraudulent Inflation of Drug Prices Injures Participants and Plan Sponsors*

109.    In 2017, for Medicare Part D beneficiaries, there is an initial $400 deductible phase during which many Medicare Part D plan participants must foot the entire bill for their prescription drugs, **which have been fraudulently inflated as a result of Defendants' conduct**.

110.    After meeting the $400 deductible, Medicare Part D sponsors are responsible for 75% of all payments in the second phase. Beneficiaries stay in this phase until they and the plan have spent a total of $3,700 on covered drugs. Paying 75% of an inflated price injures these participants.

111.    Upon hitting the second coverage breakpoint, the beneficiary is in what is known as the Medicare Part D "Donut Hole," which refers to a coverage gap phase where the beneficiary must pay for branded drugs at 40% of the list price.   The manufacturer discounts

branded drugs by 50%, and the plan pays the remaining 10%. Again, the percentage-of-cost requirement means that inflated drug prices hurt Part D sponsors in this third coverage phase.

112.    A beneficiary leaves the coverage gap and is covered again after spending a total of $4,950 out-of-pocket—which is also when total drug costs covered by the participant, the plan, and discounts reach $7,425. At which point, the Part D Sponsor pays 15% of the list price,



NOTE: Some amounts rounded to nearest dollar. ¹Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.

while original Medicare pays 80%.

## The FDA Regulatory System

113.    Under the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d). Approval of the drug by the FDA is the final step in a multi-year process of study and testing, and manufacturers are prohibited from marketing a drug

in the United States that is not considered "safe and effective" **for its intended and manufacturer stated use**, pursuant to FDA regulations.

114.     The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices, and guidance documents. The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" has been interpreted to mean a clinical study with (1) clear objectives; (2) adequate design to permit a valid comparison with a control group; (3) adequate selection of study subjects; (4) adequate measures to minimize bias; and (5) well-defined and reliable methods of assessing subjects' responses to treatment. See 21 C.F.R. § 314.26. **Defendants' fraudulent conduct in marketing their drugs in the United States flouted the FDA's regulations and guidelines, and they have admitted to same.**

115.     Because of the modern evolution of clinical studies and science producing more reliable results, the FDA has been given broader latitude in reaching a determination that a drug is safe and effective for its intended use. But in all cases, a proper efficacy study and at least one robust clinical trial must be conducted pursuant to the regulations.

### *The Key Components of Drug Labeling and Marketing*

116.     A prescription drug's product labeling is a key component of the FDA approval process and the FDA continues to exercise control over product labeling even after a drug is approved. From time to time, drug labels may be modified to reflect new data and to protect patients from safety concerns.  *See* 21 C.F.R. § 201.57(3).

117.     A manufacturer like Warner Chilcott, wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label must resubmit the drug for a

series of clinical trials similar to those required for the initial FDA approval. *See* Food and Drug Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also* 21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new indication); 21 U.S.C. §§ 301 *et seq.* A supplemental New Drug Application must be filed. Unless and until an additional indication is approved by the FDA, any unapproved use is considered to be "off-label."

118.    "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population than specified on the label, *e.g.*, treating a child when the drug is only approved to treat adults.

119.    Off-label information may be disseminated only in response to an "unsolicited request from a healthcare practitioner." 21 U.S.C. § 360aaa-6. In any other circumstance, a manufacturer may disseminate information concerning off-label use only after it has submitted an application to the FDA seeking approval of the drug for the off-label use and has provided the materials to the FDA prior to dissemination; and the materials themselves are submitted in unabridged form and are neither false nor misleading. 21 U.S.C. §§ 360aaa(b) & (c); 360aaa-1.

120.    Thus, the FDA prohibits labeling — including all marketing and promotional materials relating to a drug — that describes intended uses for a drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. Promotional materials may only make claims that are supported by "substantial" scientific evidence (according to strict scientific procedures) and they may not be false or misleading. Illegal "misbranding" can result in criminal penalties. See

121.   21 U.S.C. § 333.  **"Off-label" marketing and "misbranding" may result in criminal penalties, and underlies the criminal conduct admitted to by Defendants here.**

122.   The prohibitions on off-label marketing and misbranding apply with equal force to manufacturer promotions to both healthcare providers (doctors) and consumers.

123.   Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, *the FDA does not regulate the practice of medicine*. Once a drug is approved for a particular use, the FDA does not prohibit health care professionals from prescribing the drug for uses that are different than those approved by the FDA. When considering off-label prescribing, health care professionals depend on the patient-specific evidence they have available to them. This includes the particular patient, the severity of his or her problems, the successfulness of prior treatment, and the risks of not treating. Whether contemplating on- or off-label use, health care professionals also rely on personal experience, recommendations from colleagues and academics, educational seminars, and evidence from clinical trials. Much of what health care professionals rely on is information (or, as the case may be, misinformation) provided by sales representatives from drug manufacturers, manufacturer sponsored continuing medical education ("CME") courses and speaker programs, and manufacturer-sponsored clinical trials.

124.   Although health care professionals may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use or patient group that the FDA has not approved. The FDA "interprets the term 'advertisement' to include information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product." *See* Final Guidance on Industry Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074 (Dec. 3, 1997).  Any manufacturer

speech explaining one of its products is an "advertisement" for the product and is subject to the prohibitions against off-label marketing in 21 C.F.R. 202.1, as well as the FDA's "fair balance" requirement, described below. *Id.*

125.    The FDA regulations that fall under the general rubric of 21 C.F.R. 202.1(e)(6), *et seq.*, ban advertisements that are false, lacking in fair balance, or otherwise misleading. The use of unsubstantiated comparative claims is also prohibited by law. *See* 21 U.S.C. § 352; 21 C.F.R. § 202.1(e)(6). Thus, companies such as Warner Chilcott may not promote their approved drugs through unsubstantiated comparative claims that exalt their drugs as safe as or more efficacious than competitors' drugs. Such promotion renders a drug "misbranded" and no longer eligible for reimbursement by Federal Programs, including Medicaid.

126.    The FDA has interpreted oral communications as falling under the umbrella of "labeling."

127.    In sum, the off-label regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body – that is, the FDA. And the prohibition on unsubstantiated comparative claims protects patients and consumers by ensuring that the prescription and use of approved drugs is not based on misleading marketing tactics.

128.    **Defendants here have admitted to fraudulently misinforming healthcare professionals as to efficacy and use in order to pump up the sales of certain of their drugs.**

### *Drug Samples and Coupon Abuses, Accurate Reporting by Providers*

129.    The Federal Prescription Drug Marketing Act ("PDMA") prohibits manufacturers from trading on free samples or coupons. 21 U.S.C. §353 provides that "No person may sell, purchase, or trade or offer to sell, purchase, or trade any drug sample" (emphasis added). In

addition, "No person may sell, purchase, or trade, offer to sell, purchase, or trade, or counterfeit any coupon. For purposes of this paragraph, the term 'coupon' means a form which may be redeemed, at no cost or at a reduced cost, for a drug which is prescribed in accordance with section 503(b)" (emphasis added).

130.    Warner Chilcott abused its free samples and coupon program by offering a "trade" with health care professionals to prescribe its drug products. Warner Chilcott's offers to "trade" its free products and coupons in exchange for prescriptions succeeded, and, in doing so, violated the letter and spirit of the PDMA.

131.    Moreover, Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any ... payment under a Federal health care program." *See* 42 U.S.C. §1320-a-7b(a)(l).  Providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other Federal health care programs must disclose those omissions or errors to the Government. *See* 42 U.S.C. §1320-a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program, and other Federal and State funded health care programs. See, e.g., 42 CFR §§ 1003.l05, 1003.102(a)(l)-(2).

## The Anti-Kickback Statute

132.    Soon after the establishment of the Medicare and Medicaid programs unethical provider practices began to develop. Problematic arrangements took various forms, including percentage lease agreements and payment of test interpretation fees to physicians who referred testing without performing the interpretation themselves.

133.     To combat these unethical practices, Congress passed the original version of the Anti-Kickback Statute ("AKS") in 1972. The statute made the receipt of kickbacks, bribes, or rebates in connection items or services covered by the Medicare and Medicaid programs a crime.

134.     The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person to purchase or recommend any good, service, or item covered under a federal health care program. *See* 42 U.S.C. § 3729(b)(2).

135.     Compliance with the AKS is a condition of payment in Federal health care programs. Claims that include items or services resulting from a violation are not payable under Federal health care programs.

136.     The foundation of the AKS is based on the realization that kickbacks in health care can lead to overutilization of medical services or products, increased program costs, corruption of medical decision making, patient steering, and unfair competition.

137.     A violation of the AKS – even if the service or item was medically necessary, provided, and appropriately billed – constitutes a *per se* violation of the FCA.

138.     Further, the ACA amended the ACA to provide that "a person need not have actual knowledge … or specific intent to commit a violation." *See* 18 U.S.C. § 1347(b).

139.     It is enough that a defendant knew, or should have known (a disregard of readily available information in the profession), that the conduct was generally unlawful.

140.     In May 2003, the Office of the Inspector General ("OIG") of Health and Human Services ("HHS") released guidance identifying in greater detail several marketing practices of drug manufacturers that constitute "kickbacks and other illegal remuneration" infecting federal health care programs. OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003). The 2003 Guidance cautions manufacturers that any time a

manufacturer provides anything of value to a physician who might prescribe the manufacturer's product(s), the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. The OIG Guidance lists the following, among others, as suspect practices:

(a)     Improper Switching Arrangements: These are arrangements by which pharmaceutical manufacturers offer physicians cash or other benefits to change prescriptions from a competitor's product to the manufacturer's product.

(b)     Improper Consulting and Advisory Payments: These are payments made pursuant to less than bona fide consulting or advisory arrangements, such as payments to physicians for simply attending meetings or conferences in a passive capacity, or for services connected with a manufacturer's marketing activities.

(c)     Improper Payments for Detailing: These are payments to physicians for time spent listening to sales representatives' market pharmaceutical products, or for accessing web sites to view marketing information.

(d)     Improper Business Courtesies and Other Gratuities: These are gifts such as merchandise of more than trivial value, entertainment, recreation, travel, meals, and other gratuities furnished in association with information or marketing presentations.

(e)     Improper Educational and Research Funding: This refers to funding for research or education that is initiated or influenced by the manufacturers' sales or marketing departments. Id. at 23731-39.

141.    Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Health Benefit Program, and other federal health care programs.

142.    **Defendants here have admitted committing healthcare fraud in violation of the AKS.**

## FACTUAL ALLEGATIONS

### The Federal Charges Admitted to by Defendants

143.    On April 15, 2016, U.S. Attorney David Schumacher stated at Warner Chilcott's sentencing hearing: "Had this case gone to trial, the government would have proven beyond a reasonable doubt that Warner Chilcott committed healthcare fraud."   *See* Transcript of April 15, 2016 Hearing at 12:8–10, Case No. 1:15-cr-10327 (D. Mass.) ("Transcript" or "Exhibit A"). The government went on to detail for the Court the specifics of Warner Chilcott's "multi-prong" scheme to defraud Medicare.  Specifically, three schemes were enumerated by the government: 1) illegal kickbacks through "MedEd" events and similar programs (affecting all products identified here); 2) the manipulation of "prior authorizations" (insurance fraud) with regard to Atelvia and Actonel; and 3) unlawful promotion of Actonel, primarily by wrongfully stating it was clinically superior to similar non-Warner Chilcott drugs.

### Scheme 1 - The Kickbacks Affecting All Warner Chilcott Products.

144.     The crux of the Warner Chilcott fraud was the use of kickbacks (in violation of the AKS).  For instance,

> the entire sales force was to obtain prescriptions by giving things to healthcare professionals, by taking them out for repeated dinners, by signing up the highest prescribers to speaker engagements, and then once the speakers were signed up, if they weren't prescribing at a sufficient level, Warner Chilcott Sales employees were instructed that they should inform the doctors that if they didn't write more prescriptions that they would no longer be used at future paid speaking events.
>
> These dinners were euphemistically labeled "medical education events" or "**MedEd events**." In fact, there was very very little, if any, education that was provided at a typical dinner. The sales force was instructed that they should not hold educational didactic programs but rather just take the doctors out to a nice dinner, no agenda and just build a relationship over a relaxed dinner amongst friends at some of the nicest restaurants in town.

Prescribers were taken out to repeated dinners, there were no limits with respect to the sales representatives' expense accounts. In fact, they had to do two dinners, two of these dinners a week as a condition of their employment, and they were structured to then leverage their relationships by demanding prescriptions in response to the dinners.

Transcript at 12:20 – 13:17 (emphasis supplied).

145.    The U.S. Attorney went on to explain that Warner Chilcott's MedEd events and kickbacks were "a core" Warner Chilcott tactic and that it existed across all of its product lines and divisions.  Transcript at 13:12.   Therefore this fraud affected all of the dugs at issue here: Atelvia, Actonel, Asacol HD, Doryx, Enablex, Estrace Cream, Loestrin, and Lo Loestrin.  These were Warner Chilcott products at all material times to the allegations of this Complaint.

146.    The illicit kickback scheme, which included the MedEd events and speaker fees, as well as happy hours, preceptorship fees, concert and event tickets, and golf trips, was an effective means of inducing health care professionals to prescribe the Warner Chilcott Products, and of inducing their staffs to facilitate reimbursement of the Warner Chilcott Products through prior authorizations.   As a result of the illicit scheme, government programs and Plaintiffs' assignors reimbursed Defendants monies they were not entitled to.

### MedEd Overview

147.    Warner Chilcott has used promotional speaker programs as the core tool to sell its products. The majority of these speaker programs, however, lacked speakers. These nonspeaker events have essentially been "happy hours" for doctors and/or their staffs. Managers instructed sales representatives to invite "high-decile" health care professionals, that is, those with a high-volume prescribing potential; the staffs of difficult-to-see doctors; and/or staff in charge of processing prior authorization paperwork.

148.    The aim of this strategy was to convince health care professionals and their staffs that they owe sales representatives for the drinks, dinners, and speakers fees that have been provided to them. Sales representatives sought health care professionals' commitment to prescribe Warner Chilcott's products.  In the FCA complaint that gave rise to the criminal plea at issue here, Relators told how they were instructed by their Warner Chilcott managers to "beat doctors into the ground" if they failed to follow through. As new hires, Relators were told to "call doctors on their shit." That is, if a doctor told a representative he wrote (or will write) a prescription for a Warner Chilcott prescription but failed to do so, the representative were to pull out payment data from IMS Health, Inc., which shows health care professionals' prescribing behavior, and say: "No, you didn't! Look at your data!"  Doing so was commonly referred to at Warner Chilcott as the "business conversation."

### *The Asacol HD Example*

149.    As an example, Relators stated that at the direction of managers, conducted a MedEd related to an ulcerative colitis drug known as Asacol HD at Ruth Chris' Steakhouse in Troy, Michigan. In attendance were Drs. Hans-Juergen Stein, Omar Kadro, and Harry Wasvary, as well as the entire staff of their practice. The bill was $1,820. There was no discussion of Asacol HD or any other Warner Chilcott product during the event.

150.    The Relator held another MedEd at Shiraz Restaurant in Bingham Farms, Michigan.  In attendance were gastrointestinal doctors Michael Piper, Mark Devore, Bradley Warren, Randall Jacobs, and six GI fellows. There was no serious clinical discussion of Asacol HD or any other Warner Chilcott product. The Relator Goan promoted Asacol HD to individual health care professionals "on the side." The bill was $1,264. Relator held these events at the repeated instructions of his managers. He believed that he would be fired if he did not do so.

Indeed, the Relators stated that numerous representatives were fired for failing to meet their quota of MedEd events.

151.    Since there has been absolutely no educational purpose to these MedEds, their only purpose was to build relationships with the attendees for sales representatives to later leverage in "business discussions." During a business discussion, a sales representative informs the physician or staff member that he or she owes it to the representative and Warner Chilcott to prescribe Warner Chilcott's drugs — or, in the case of a staff member, to process the prior authorization paperwork to ensure reimbursement for those drugs. In many instances an explicit business discussion was not necessary, as health care professionals and staff understood the implicit terms of the arrangement and taken these actions on their own initiative.

152.    Warner Chilcott representative had a budget of $15,000 to $20,000 per month, or as much as $240,000 per year, for Med Ed programs. This is nearly nineteen times higher than the industry average for such events of some $13,000 per year. Warner Chilcott's budget has only represented the limit on representatives' credit cards. Warner Chilcott tracked spending by brand, but there has been no brand limit. In theory, a representative could have spent his or her entire $20,000 budget to take doctors out to dinner for a single product.

153.    The centrality of MedEds to a sales representative's job duties was emphasized by a new field coaching report template which prominently included field ratings of sales representatives on the following: "Develops Speakers (how many)," "# MedEds last 31 days," "# MedEds last 31 days with Speaker," "# MedEds planned next 31 days," "# MedEds next 31 days w/ speaker," and "Last MedEd attended by DM [District Manager]."

154.    In the case of Asacol HD, Warner Chilcott also used didaditic programs by Dr. Timothy Nostrant, a professor of gastroenterology, pediatric gastroenterology, and internal

medicine at the University of Michigan, to promote the off-label use of Asacol HD throughout the United States. In 2010 alone, he gave 72 promotional programs for which he was paid $3,000, plus expenses, per program, or some $216,000 in honoraria. The primary topic of Nostrant's program, wildly popular among gastroenterologist attendees, was "How to Increase Revenue and Decrease Jail Time." The Nostrant program instructed attendees how to increase their revenue by increasing the relative value units, or "RVUs," in their Medicare and Medicaid billings.

155.    The majority of Nostrant's program, usually some 70 to 80 minutes in length, had nothing to with Asacol HD but rather instructed health care professionals how to increase their Medicare and Medicaid reimbursements. Only in the final five minutes of his presentation did Nostrant discuss the use of Asacol HD for the off-label treatment of a number of chronic intestinal disorders, including Crohn's disease and various other forms of inflammatory bowel disease. Asacol HD was only indicated for the acute treatment of moderately active ulcerative colitis.

156.    Warner Chilcott's free program on Medicare reimbursement caused health care professionals to prescribe Asacol® HD rather than cheaper, more clinically appropriate, and onlabel alternatives. The program was a clear quid pro quo, and health care professionals found it to be of tremendous value because it resulted in greater Medicare and Medicaid reimbursements. In the absence of Warner Chilcott's free provision of this tutorial, health care professionals would have been necessitated to pay for it themselves. In exchange for the Warner Chilcott's provision of Dr. Nostrant's program, these doctors prescribed Asacol HD. For those doctors that did not immediately begin prescribing Asacol HD, representatives were instructed to

tell health care professionals that they "owed" Warner Chilcott for the program, and that as a result, they should prescribe Asacol HD in lieu of lower priced and/or on-label alternatives.

157.    The conduct violated AKS and FDA regulations prohibiting promotional content of speaker programs from espousing uses and claims not supported by the FDA-approved labeling for particular drugs.  These fraudulent acts wrongfully induced increased prescriptions of Asacol HD to the detriment of the MAOs.

158.    And, as reported by the FCA Relators, if a sales representative complained they were fired and given a severance package to keep them quiet.  For example, at the end of 2010, Marcie Cowing, a Gastrointestinal/Dermatology sales representative in Kentucky, objected to her manager's instructions that she engage in illegal off-label promotion, leverage MedEds as kickbacks, and falsify prior authorization requests, all in order to drive sales of Asacol HD. Cowing sent an e-mail detailing her concerns to upper management, including District Manager John Lufborrow and National Vice President for Gastroenterology and Dermatology Nicola Crawford. In response, her manager called her, and following a conversation in which he intimidated and threatened Cowing, fired her. She was "packaged out" the following day. Cowing's experience is paradigmatic of the way in which Warner Chilcott recurringly forced employees to engage in illegal practices, then intimidated and bought the silence of those who threatened to disclose them

### *Estrace Cream, Loestrin, Lo Loestrin Examples*

159.    As Relators stated, the MedEd philosophy was pervasive throughout all divisions of Warner Chilcott.  Relators reported on sales representative Mark Szachowicz, a Women's Healthcare Representative for the greater Milwaukee area. Szachowicz would have been responsible for Estrace Cream (vaginal cream), Loestrin and Lo Loestrin (contraceptives),

among other drugs.  As of early 2011, Szachowicz was ranked in the top 12% of representatives

on the Women's Healthcare sales force and was recognized in a voicemail from Regional Sales

Director Michael Koellhoffer as a "perfect example of what success can and should look like."

Representative Szachowicz — who averaged four MedEds per week and utilized his entire

budget on a regular basis — regularly paid for MedEds but rarely himself actually attended them.

Thus, no medical information was actually conveyed. Prescriptions were simply bought.

160.    Szachowcz's practice of paying for but not attending his Med Ed programs was

not unprecedented. For example, Warner Chilcott had at times maintained open credit card

accounts at several restaurants in Long Island, New York, for high-decile health care

professionals, allowing doctors to take their families to dinner whenever they please without the

presence of a sales representative.

161.    According to Relators, this practice was common and pervasive at Warner

Chilcott. For example, on February 18, 2011, Vice President Koellhoffer forwarded a voicemail

message from District Manager Brett Hayes, who had himself forwarded a voicemail message

from sales representative Caroline Hammond, in which Hammond discussed the importance of

leveraging MedEd events to induce office staff to submit prior authorizations for the Warner

Chilcott Products. As Hammond herself related in her voicemail message, in exchange for doing

prior authorizations, she asked the medical staff: "What can I do for you? Let's all go out... We

have the budget that allows us to do that..." She then said that, as a result of entertaining the staff,

"I am completely expecting those prior authorizations to get approved."

162.    **Specific to Estrace Cream**, Between January 1, 2011 and August 4, 2011,

Warner Chilcott paid Dr. Manish Gopal, 19 Continental Court, South River, NJ, in connection

with eight speaker programs for which Warner Chilcott paid Dr. Gopal $700 per program, or

$5,600 in total. While Warner Chilcott purported to make these payments to compensate Dr. Gopal for his services as a promotional speaker for Estrace, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Gopal to prescribe Estrace.

163.    Between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Joseph Berger, 415 East 52nd Street, New York, NY, in connection with 24 speaker programs for which Warner Chilcott paid Dr. Berger $700 per program, or $16,800 in total. While Warner Chilcott purported to make these payments to compensate Dr. Berger for his services as a promotional speaker for Estrace, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Berger to prescribe Estrace.

164.    Between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Eric Elias, 1546 Gary Drive, Breaux Bridge, LA, in connection with three speaker programs for which Warner Chilcott paid Dr. Elias $700 per program, or $2,100 in total. While Warner Chilcott purported to make these payments to compensate Dr. Elias for his services as a promotional speaker for Estrace, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Elias to prescribe Estrace.

165.    As a result of the kickbacks paid by Warner Chilcott to induce Estrace prescriptions, doctors prescribed Estrace to Medicare beneficiaries, which caused injurious overpayments by MAOs.

166.    **Loestrin 24 Fe** is an oral contraceptive, introduced in 2006 by Warner Chilcott as a replacement for Loestrin Fe 1/20, which was first introduced in 1973. The majority of oral contraceptive products currently used in the United States are based on a regimen of 21 days of active hormonal pills followed by 7 days of placebo. In contrast, Loestrin 24 Fe therapy entails active treatment for 24 days followed by 4 days of placebo.

167.    The market for oral contraceptives is extremely competitive, and as such, most of the major branded drug manufacturers do not participate, preferring instead to focus on areas with higher margins. Warner Chilcott used MedEd events to induce prescriptions of Loestrin 24 Fe and **Lo Loestrin**.

168.    In keeping with its Company-wide promotional strategy, MedEds and other kickbacks were at the heart of Warner Chilcott's promotion of Loestrin 24 and Lo Loestrin, through which it not only sought to induce health care professionals to prescribe but also unduced medical staffs to switch patients to these drugs. Sales representatives were been trained to "stay close" to triage nurses, who frequently make oral contraceptive prescribing decisions. Doing so meant regular MedEd "happy hours" with office staff.

169.    Warner Chilcott trained its sales representatives to engage in the "business discussion" with doctors who attend MedEd events but do not prescribe Loestrin 24 Fe or Lo Loestrin. Managers instructed sales representatives to get "aggressive" with doctors, such as by asking, "Doctor, do you hate my guts? Doctor, do you know how much Loestrin 24 you have written over the past three months?"

170.    As an example, between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Darryl Boffard, 290 Hartshorn Drive, Short Hills, NJ, in connection with 14 speaker programs for which Warner Chilcott paid Dr. Boffard $700 per program, or $9,800 in total. While Warner Chilcott purported to make these payments to compensate Dr. Boffard for his services as a promotional speaker for Loestrin 24 Fe and Lo Loestrin, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Boffard to prescribe Loestrin 24 Fe and Lo Loestrin.

171.   As another of many, many examples set forth by the FCA Relators, between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Jacquelyn Cortez, 512 Hunt Drive, Placentia, CA, in connection with 30 speaker programs for which Warner Chilcott paid Dr. Cortez $700 per program, or $21,000 in total. While Warner Chilcott purported to make these payments to compensate Dr. Cortez for her services as a promotional speaker for Loestrin 24 Fe and Lo Loestrin, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Cortez to prescribe Lo Loestrin.

172.   The preceding examples are representative, but not exhaustive, of the thousands of instances in which Warner Chilcott has paid speaker fees to health care professionals as kickbacks to prescribe Loestrin 24 Fe and Lo Loestrin.  As a result of kickbacks paid by Warner Chilcott, doctors were fraudently induced to prescribe Loestrin and Lo Loestrin to Medicare beneficiaries, which caused injurious overpayments by MAOs.

### Atelvia and Actonel Examples

173.   Actonel and Atelvia are osteoporosis drugs and Warner Chilcott relied on its tried and true approach to pump up sales of the drugs, especially since Actonel was an older drug and Atelvia was a newer, supposedly better version.  In 2011, Actonel had been the best-selling branded oral bisphosphonate in the United States with then annual sales of $771 million.

174.   Although Actonel was the market leader in 2011, that position was due to the patent expiration of Merck's Fosamax, which far outsold Actonel during Fosamax's branded life. In 2007, U.S. sales of Fosamax were $1.4 billion, compared to $791 million for Actonel. The entry of generic Fosamax in early 2008 began to substantially erode sales of Actonel, which dropped 40% the following year.

175.     To stem this revenue decline and protect against fallout from a successful challenge to Actonel's patent, Warner Chilcott sought to transition the Actonel market to its follow-on product Atelvia, which was approved in October of 2010 and entered the market in early 2011.  However, it still continued to find ways to fraudulently promote Actonel sales.

176.     The centerpiece of Warner Chilcott's promotion of Actonel and Atelvia was the use of speaker fees as kickbacks to health care professionals to prescribe both drugs. Warner Chilcott leveraged these kickbacks exclusively with regard to Actonel until the end of 2010, when it shifted the focus of its scheme to Atelvia preceding its launch in January 2011. Warner Chilcott tracked the quantity of Actonel and Atelvia that speakers prescribed, explicitly requesting that speakers whose prescribing rate it considered insufficient to prescribe more, and firing those who did not.

177.     When the FCA Relators began at Warner Chilcott, MedEds with speakers were much less frequent than those without speakers. However, when Atelvia launched in January 2011, speaker fees became the key kickback that Warner Chilcott used to induce health care professionals to prescribe the drug: in mid-2011, the majority of Atelvia prescriptions were written by paid speakers. Realizing that speaker fees were even more effective inducements than it had previously thought, Warner Chilcott not only increased its number of speakers for Atelvia but expanded the tactic to its other drugs as well.

178.     Steve Justice, an Atelvia representative in St. Louis, Missouri, who led his district in spending on MedEds and speaker programs, was held up as an example by District Manager Brett Hayes and VP Koellhoffer for having taken health care professionals pheasant hunting. DM Hayes requested that Justice do a write-up e-mail about the hunt and how it allowed him to sell to two key doctors. That e-mail was then forwarded throughout Warner Chilcott as a best

practice. In addition, VP Koellhoffer left a voicemail for his entire region praising Justice's tactics.

179.    As one of the many examples, Dr. Eleonora Fedonenko 6221 Wilshire Blvd Suite 312, Los Angles, CA, served as a regular paid speaker in Los Angeles, California. Although Dr. Fedonenko had already prescribed a significant quantity of Actonel before she started serving as a speaker, she also had prescribed competing bisphosphonates, and Warner Chilcott sought to increase her Actonel prescribing even further. The speaking fees provided to Dr. Fedonenko served as both rewards for the Actonel that she was already prescribing as well as inducements to prescribe additional Actonel, which she did as a result of Warner Chilcott's payment of speaker fees. Between June and December 2010, Dr. Fedonenko conducted 21 speaker programs in conjunction with which Warner Chilcott paid her $12,600.   Warner Chilcott made these payments in order to induce Dr. Fedonenko to prescribe Actonel.

180.    Prior to Atelvia's official launch in January 2011, Warner Chilcott promoted the drug through an "Early Experience Program," through which it sought to sign up advocates — *i.e.*, paid speakers — for Atelvia. The true focus of the program was to leverage speaker fees as kickbacks to induce these health care professionals to prescribe Atelvia, and in keeping with that aim, Early Experience participants were selected based on their potential to prescribe a high volume of Atelvia.

181.    Seeking to induce as many health care professionals as possible, Warner Chilcott signed up speakers at a rate that greatly exceeded its legitimate educational and promotional needs. Two months following the launch of Atelvia, as of March 1, 2011, there were already some 708 Atelvia speakers. Nonetheless, shortly thereafter Warner Chicott's Reichel instructed sales representatives to increase their number of Atelvia speakers ever further to nine speakers

per territory, or some 3,330 nationwide. As an example of the inordinate number of health care professionals Warner Chilcott enlisted as speaker, a sales representative in New York City enlisted some 248 speakers out of his total call panel of 270 health care professionals. That is, 92% of the representative's assigned doctors were speakers. The strategy was greatly successful, and for months following Atelvia's launch, the majority of Atelvia prescriptions were written by paid speakers.

182.     Sales representatives were given even more blatant instructions to leverage speakers fees as kickbacks during a May 2011 Plan of Action ("POA") meeting held in Chicago. While Warner Chilcott's promotion of other drugs had largely relied on MedEds without speakers, Koellhoffer repeatedly emphasized the importance of conducting Atelvia program with speakers.

183.     During his presentation on the morning of May 17, 2011, Koellhoffer told the gathered representatives that their colleagues on the East and West Coasts had been particularly successful using speaker events to generate prescriptions for Atelvia, taking speakers out two to three times per month. Taking speakers out routinely like this, he continued, changes a physician's relationship with the representative: health care professionals are human, and as such, they will write more Atelvia in response. How often a representative should take out a speaker, Koellhoffer said, depends on what's right for that representative's particular business. The relevant question, he said, is are you getting fair money for the value you're investing?

184.     Koellhoffer repeatedly emphasized that the purpose of MedEds was to generate a return on investment and that sales representatives needed to hold health care professionals accountable for writing prescriptions in exchange for being able to attend the events. Koellhoffer

told sales representatives that while many MedEd events had been conducted, representatives now needed to think how to make their health care professionals work harder for them.

185.     Despite the egregiousness of the promotional violations described above, District Manager Johnson told the FCA Relator that the POA meeting as it was originally planned by Koellhoffer included even more blatant instructions to representatives to engage in violative promotions. Only following dissent by DM Johnson and other district managers did Koellhoffer agree to reduce the extent of his violative instructions to sales representatives.

186.     On July 8, 2011, one of the FCA Relator had a one-on-one telephone call with her new district manager, Craig Ott, who described the importance of not only speaker fees, but speaker training fees, to inducing health care professionals to prescribe Atelvia. "When a physician goes through speaker training," Ott instructed the Relator, "you should be there with that physician in order to follow up and ask: ok, doc, now how can you incorporate Atelvia into your practice?"

187.     On July 8, 2011, DM Ott also hosted a district teleconference during which he expressed his disapproval that only six paid speakers were signed up for the entire district, and worse, that they had written in aggregate one prescription of Atelvia. This, Ott said, was entirely unacceptable. Representatives needed to hold speakers accountable to ensure that they were writing an adequate number of prescriptions for Atelvia, he said. At no point did Ott reference using speakers to convey information about Atelvia. Rather, the entire discussion concerned his expectation that health care professionals prescribe Atelvia in exchange for maintaining their roles as paid speakers.

188.     As further examples of the use of the paid speaker scheme, between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Michael Lewko, 871 Allwood Road, Clifton,

NJ, in connection with ten speaker programs for which Warner Chilcott paid Dr. Lewko $600 per program, or $6,000 in total. While Warner Chilcott purported to make these payments to compensate Dr. Lewko for his services as a promotional speaker for Atelvia, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Lewko to prescribe Atelvia.

189.    And as another example of many seth forth by the FCA Relators, between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Robert Fogari, 3053 Kennedy Blvd., Jersey City, NJ, in connection with ten speaker programs for which Warner Chilcott paid Dr. Fogari $600 per program, or $6,000 in total. While Warner Chilcott purported to make these payments to compensate Dr. Fogari for his services as a promotional speaker for Atelvia, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Fogari to prescribe Atelvia.

190.    Although Atelvia was the focus of Warner Chilcott's kickback scheme following January 2011, Warner Chilcott also leveraged kickbacks to induce health care professionals to prescribe Actonel when formulary restrictions precluded those health care professionals from prescribing Atelvia. Sales representatives demanded that speakers and other recipients of Warner Chilcott's kickbacks prescribe Atelvia, but accepted prescriptions of Actonel in exchange for those kickbacks when achieving insurance approval for Atelvia was unfeasible. In such cases, Warner Chilcott's kickbacks induced health care professionals to prescribe Actonel instead of cheaper competitors such as generic Fosamax. As such, most of the health care professionals subject to Warner Chilcott's kickback scheme prescribed a mixture of Atelvia and Actonel.

191.    Warner Chilcott knew and intended that its payment of kickbacks to health care professionals, though primarily directed at Atelvia, caused those health care professionals to prescribe Actonel, which Warner Chilcott regarded as preferable to health care professionals prescribing competitors such as generic Fosamax.

192.    As a result of kickbacks paid by Warner Chilcott, Dr. Malayan prescribed Atelvia and Actonel to Medicare beneficiaries – who could have been prescribed the cheaper generic, Fosamax – which caused injurious overpayments by MAOs.

### Doryx Example

193.    Warner Chilcott has promoted Doryx through an illegal scheme of kickbacks, falsified prior authorization requests, cost-sharing waivers, and off-label and misleading promotional claims. Doryx is a delayed-release formulation of doxycycline hyclate and only minimally differentiated from its competitors, which have included generic versions of Doryx 75 and 100 mg since early 2011, and Doryx 150 mg since March 2012. Hence, Warner Chilcott's illegal promotional practices have been particularly necessary to drive Doryx's market share, and were largely responsible for increasing 2011 sales to $173 million.

194.    As a tetracycline-class antibiotic which prevents the growth and spread of bacteria. Doxycycline treats bacterial infections, including pneumonia and other respiratory tract infections; Lyme disease; acne; infections of skin, genital, and urinary systems; and anthrax poisoning (after inhalational exposure). It is also used to prevent malaria.

195.    Doryx is approved by the FDA for a number of uses; however, Warner Chilcott has promoted it almost exclusively for the treatment of acne. Doryx is FDA approved for adjunctive treatment of severe acne.

196.    Doryx has faced heavy competition on multiple fronts, including from generically available immediate-release formulations of doxycycline and minocycline, as well as from branded, delayed-release formulations such as Solodyn (minocycline) and Adoxa (doxycycline). Kickbacks in the form of MedEds and speaker fees have been Warner Chilcott's primary means of inducing health care professionals to prescribe Doryx.

197.    Warner Chilcott's promotional strategy for Doryx was so heavily reliant on kickbacks, to the exclusion of clinical or scientific promotional claims, that sales representatives did not learn any medical information related to Doryx. Instead, managers instructed them to take dermatologists out to dinner and to add them, without limit, as paid speakers.

198.    For health care professionals who have attended these MedEds and were the beneficiaries of Warner Chilcott's largesse, sales representatives were instructed to follow up with "business conversations," during which sales representatives have held doctors accountable for prescribing a sufficient quantity of Doryx 150 mg.

199.    At the insistence of his managers, one of the FCA Relators held numerous MedEd events, another of which was held on September 23, 2010, at Tallulah Wine Bar, in Birmingham, Michigan. Four dermatological fellows attended. By Relator's account, only a few minutes were spent discussing Doryx, and the event was "mostly a party." By avoiding clinical discussion, Relator Goan was not deviating from the instructions of his managers; rather, he was explicitly following them. The bill was $331.

200.    On February 7, 2011, Warner Chilcott held regional conference calls concerning the promotion of Doryx 150 mg. The key topics discussed were: (a) the expectation that sales representatives complete prior authorizations for health care professionals, and (b) the need to get dermatologists and their staffs out to do MedEd events.

201.    The preceding examples are representative, but not exhaustive, of the thousands of instances in which Warner Chilcott paid speaker fees to health care professionals as kickbacks to prescribe Doryx, and thereby caused fraudulent overpayments by Medicare and MAOs.

*Enablex Example*

202.    Enablex (darifenacin extended-release tablets) was approved by the FDA on December 22, 2004, for treatment of overactive bladder with symptoms of urge urinary incontinence, urgency, and frequency. Urge urinary incontinence is characterized by a pressing impulse to void, followed by the involuntary leakage of urine as a result of the inability to control bladder function. Darifenacin is an antimuscarinic-class drug, which works by relaxing the muscles of the bladder.

203.    The patent for Enablex was originally scheduled to expire in March 2010; however, it was extended until March 2015 to compensate for time lost during drug development. The formulation patent protecting Enablex did not expire until August 2016.

204.    Medicare Part D and Medicaid are both significant purchasers of Enablex.

205.    To induce health care professionals to prescribe Enablex, Warner Chilcott leveraged the various forms of kickbacks described above, including speaking fees and attendance at MedEd events.

206.    For instance, according to the FCA Relators, between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Steven Maislos, 7737 Southwest Freeway, Houston, TX, in connection with seven speaker programs for which Warner Chilcott paid Dr. Maislos $700 per program, or $4,900 in total. While Warner Chilcott purported to make these payments to compensate Dr. Maislos for his services as a promotional speaker for Enablex, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Maislos to prescribe Enablex. As a result of kickbacks paid by Warner Chilcott, Dr. Maislos prescribed Enablex to Medicare beneficiaries, which caused overpayments by Medicare and MAOs.

207.    Similarly, between January 1, 2011 and August 4, 2011, Warner Chilcott paid Dr. Eric Elias, 1546 Gary Drive, Breaux Bridge, LA, in connection with three speaker programs for which Warner Chilcott paid Dr. Elias $700 per program, or $2,100 in total. While Warner Chilcott purported to make these payments to compensate Dr. Elias for his services as a promotional speaker for Enablex, Warner Chilcott in fact made these payments as kickbacks to induce Dr. Elias to prescribe Enablex. As a result of kickbacks paid by Warner Chilcott, Dr. Elias prescribed Enablex to Medicare beneficiaries, which caused overpayments by Medicare and MAOs.

208.    The preceding examples are representative, but not exhaustive, of the thousands of instances in which Warner Chilcott has paid speaker fees to health care professionals as kickbacks to prescribe Enablex, and thereby caused fraudulent overpayments by Medicare and MAOs.

### Scheme 2 – Manipulation of Prior Authorizations for Atevia and Actonel

209.    Like most commercial plans, Medicare and Medicaid prescriptions drug plans ("PDPs") have preferred drug lists known as "formularies," which designate drugs covered by PDPs. Formularies are critical mechanisms of controlling prescription drug program costs because they incentivize patients to make efficient and economical choices when medically suitable alternatives exist.  If a drug is on a formulary, it will be covered when prescribed (potentially subject to restrictions to ensure that it is being properly prescribed).  A formulary generally includes at least one drug in each therapeutic category.

210.    In most instances, drugs that are not on the plan's formulary are not covered by the plan, and patients must pay the full cost themselves. However, PDPs will make an exception and cover a non-formulary drug if the drug is medically necessary for a particular patient, *i.e.*, if

there is a reason why the on-formulary medication is not an acceptable alternative. 42 C.F.R. § 423.578. Common reasons include contraindications of the formulary medication to other medications that the patient is already taking, or prior adverse experience of the patient to the formulary-listed medication. In such cases, the prescribing physician requests a "prior authorization" (also known as an "exception request" or "coverage determination request") for the patient to receive coverage for the non-formulary drug. A legitimate clinical reason must exist to grant to the prior authorization request.

211.    Faced with unfavorable formulary status and payor resistance to reimbursing for many of its drugs, particularly Atelvia, Warner Chilcott falsified prior authorization requests in order to obtain reimbursement. In some instances, Warner Chilcott induced office staff to submit false requests for its drugs; in other instances, its sales representatives reviewed patient files and filled out prior authorization requests. In both scenarios, Warner Chilcott fabricated the reasons on the requests why patients required its particular drugs.

212.    As the U.S. Attorney explained to the Court at the April 2016 sentencing hearing:

What happens, your Honor, is that by the end of 2010 and into 2011, these osteoporosis drugs had poor insurance coverage. Insurance companies were by and large not paying for these drugs without a prior authorization from a physician. They weren't paying for the drugs because there was a generic equivalent, Fosamax, that essentially did the same thing for a whole lot cheaper.

Warner Chilcott was aware of this dynamic and aware that prior authorizations were required to push through these drugs, so Warner Chilcott executives taught the sales force all about prior authorizations and instructed them that they had to push through prior authorizations in order to get prescriptions.

However, in a busy doctor's office, many of these doctors did not want to spend the time doing prior authorizations, so Warner Chilcott took it upon itself to manipulate the prior authorizations, provide the medical reasons for prior authorizations, which were canned and largely untethered to the patients, and in many instances the sales representatives simply filled out the prior authorizations themselves writing in medical justifications that they had no idea were true or not for a particular patient, sending them into insurance companies.

So it was simple insurance fraud. Insurance companies paid for Atelvia and to a lesser extent Actonel under false pretenses.

Transcript at 14:1 – 15:1.

213.     The FCA Complaint Relators explained that while Warner Chilcott's official training materials instructed sales representatives not to mention the existence of the prior authorization process and not to participate in the completion of prior authorizations, in practice sales representatives did both. Indeed, management instructed sales representatives to actively manipulate the prior authorization process to increase sales of Warner Chilcott's drugs. At the instruction of their managers, sales representatives (1) induced physicians and staff to complete prior authorization requests; (2) coached physicians and staff on language, often false, to include in prior authorization requests; and (3) themselves completed and submitted prior authorization requests, including by reviewing patient files.

214.     These practices were pervasive nationwide, and successful in driving sales of Warner Chilcott's osteoporosis drugs. In Texas, for example, the FCA Relators reported that sales representative Holly Trevino-Blakely went from office to office filling out prior authorization forms for Atelvia. The practice was approved by her managers, including DM Gilbert Gonzalez, and during January 2011, it made her the fourth-ranked Atelvia representative in the country. Similarly, in the Long Island District of the East Region, Joel Romero has been one of the top twenty sales representatives for Atelvia because he completed prior authorizations for his offices. Indeed, Romero set up a fax machine in his house so that doctors' offices could simply fax patients' information to his wife, who filled out the prior authorization requests and then faxed them to the insurance companies or benefit providers. For both March and April 2011, sales representative Aleksandr Eygurin was the top-ranked Atelvia representative in the

nation largely as a result of his completion of prior authorization requests at offices across his territory. Eygurin did so at whatever time of day those offices would provide him access, including in the early hours of the morning.

215.     The nationwide scope of these practices has been the product of express instructions from senior managers, who routinely forwarded voicemails across the country discussing sales representatives' "success stories" using these methods. In a voicemail forwarded by RSD Mike Koellhoffer on February 1, 2011, President Reichel himself advocated using MedEds as inducements to staff to "force through" prior authorization requests. Reichel instructed:

> And if its an objection like something about prior auths, what I can tell you is the reps who are getting it done have tremendous relationships with the medical assistants, and they force through the prior auth. In other words, they work with the staff and explain to them what needs to be accomplished, etc. One of the things I've heard which is a good idea is having medical assistants for a MedEd program. They can hear about the product and why it is so important to do the prior auth, and if you have somebody who is a medical assistant that understands the mechanics of how to work these prior auths, I think that also can be beneficial for that person to you know come out to dinner.

216.     Reichel continued, "So I think this has to become, you know, a core competency of Warner Chilcott is how to work with the prior auth." The next day, on February 2, 2011, RSD Koellhoffer forwarded another voicemail, which he described as "some learnings about prior authorizations and how to pull them through the offices." In the forwarded message, sales representative Carolyn Hammond advocated "having some direct wording to give [office staff] that in this particular class [bisphosphonates] gets the prior auths approved. That was fabulous information." She then blatantly discussed using MedEds to bribe office staff to complete the prior authorization requests:

217.   In a voicemail message dated February 5, 2011, forwarded by RSD Koellhoffer, DM Brandon King emphasized the importance of falsifying prior authorization requests to increasing sales:

> We are selling the whole office because it's hyper and critical to our business, and as you heard in Carl [Reichel]'s message, doing these prior auths and being experts at getting this done, it's going to be a core competency for Warner Chilcott going forward.

218.   Warner Chilcott specifically targeted its scheme to falsify prior authorization requests at government programs, including Medicare Part D. In a voicemail message dated January 31, 2011, again forwarded by RSD Koellhoffer, sales representative Newt Landry described his success in instructing office staff on language to include on prior authorization forms for Medicare Part D beneficiaries:

> And, actually, I got to spend quite a bit of time talking to him about prior authorizations and how we're able to get the process and get them through, and I gave him copies of the Med D form and told him what to write on there…

219.   Beginning in mid-2011, Warner Chilcott began to specifically target LIS- and dual-eligible patients for its prior authorization request falsification scheme. LIS-eligible patients are Medicare beneficiaries whose income level qualifies them to receive Medicare Part D copayment and co-insurance assistance from the U.S. Social Security Administration. Dual-eligible patients are Medicare beneficiaries who are also eligible for Medicaid, and as a result receive assistance meeting copayment and coinsurance obligations, as well as additional services not covered by Medicare.

220.   Sales representatives were regularly evaluated on their success at inducing staff to aid in submission of false prior authorization requests. At Warner Chilcott, doing so was a key part of the "total office call" — *i.e.*, a sales call that goes beyond speaking only to health care professionals but also involves office staff. The "Sales Representative Performance Evaluation &

Coaching Report" template for third trimester 2011 included the category "Builds Staff Allies and executes Total Office Calls with excellence."

221.    The FCA Relators were shown a list of fellow sales representatives who were rewarded and promoted for participating in the false prior authorization scheme.  For example, at approximately the same time he was promoted, Prabhakar ("Mo") Polani was praised in a voicemail distributed to the national sales force that praised Polani's practice of himself reviewing patients' files and filling out prior authorization forms for Atelvia.  Similarly, Eduardo Chang was promoted after one of the Relator's DM's held him up as an example for filling out prior authorization paperwork. In addition, at least two others on the list, Jessi James and Stefan Mancuso, were leading participants in Warner Chilcott's scheme of falsifying prior authorizations. These sales representatives received a pay raise and became responsible for the training of newly hired sales representatives.

222.    One other tool that Warner Chilcott appropriated to facilitate sales representatives' submission of fraudulent prior authorization requests was www.covermymeds.com, a website that provided web-based software to expedite health care professionals' and pharmacists' submission of prior authorization requests by gathering together the forms and requirements of various insurance carriers. On July 23, 2012, the website's owner, CoverMyMeds LLC, sued Warner Chilcott for illegally using its software to submit some 16,000 fraudulent prior authorization forms. *See CoverMyMeds LLC v. Warner Chilcott (US), LLC*, Civ. No. 2:12-cv- 00663-GLF-TPK (S.D. Ohio). CoverMyMeds alleged that over two hundred Warner Chilcott sales representatives had, posing as health care professionals, themselves registered for and "wrongfully used CoverMyMeds to submit [prior authorization] requests." Among the Warner Chilcott sales representatives who registered and submitted fraudulent

requests were Kathryn Denisse Woods (Kentucky), Todd Burkhalter (North Carolina), Ashley Humbaugh (Florida), Michael Taynor (New Jersey), Adam Apprill (California), Brooke Dobbins, Brooke Nelson (Oklahoma), James Montemarano (New York), Robert Higgins (Florida), and Erica Handalian (California).  The CoverMyMeds lawsuit was dismissed as part of a confidential settlement between the parties on January 3, 2013.

### *Further Atelvia Fraudulent Prior Authorization Facts*

223.    As stated by the FCA Relators, when Atelvia entered the market in January 2011, it was only minimally differentiated from and far more expensive than competing oral bisphosphonates, some of which were available generically. Warner Chilcott also lacked contracts with most managed care plans, which would have allowed the plans to purchase Atelvia at a favorable rate, and thus Atelvia lacked status on those plans' formularies. The result was that, even if Warner Chilcott succeeded in inducing health care professionals to prescribe Atelvia using the litany of kickbacks described above, insurance companies would not pay for the drug. Rather than forcing their patients to unnecessarily pay hundreds of dollars out of pocket, health care professionals then switched patients to a competitor that did have coverage.

224.    Warner Chilcott's solution to overcome insurers' restrictions was to pay kickbacks to office staff to submit prior authorization requests, using MedEds as inducements to staff to do the time-consuming work of submitting the requests.  By doing so Warner Chilcott sought to evade formulary incentives that direct patients to more economical medications and lower Medicare costs.

225.    However, even with both health care professionals and staff successfully bribed and willing to prescribe Atelvia and submit formulary exception requests, they still lacked valid reasons to use to convince payors to approve them. Prior authorization requests offer a

mechanism of obtaining medically necessary therapies when no formulary alternative exists, but the reality was of course that formulary alternatives including alendronate, ibandronate, and even Actonel did exist.

226.    Warner Chilcott itself made, and paid office staff to make, false statements on prior authorization requests attesting to the unsuitability of other oral bisphosphonates as well as the unique suitability and medical necessity of Atelvia. Relying on these false statements, Medicare MAOs and their drug plan administrators approved the prior authorization requests and made reimbursements for the accompanying prescriptions of Atelvia as a result. These false statements were material to the MAOs' decisions to make those reimbursements.

227.    One of the pioneers and most egregious examples of the Warner Chilcott's falsification of prior authorization requests was Sales Representative and later Field Manager Polani.   On January 13, 2011, Polani sent a voicemail to his district in which he explicitly described his involvement submitting false prior authorization forms and also violating patient HIPAA protections in the process:

> I have been doing lots of prior authorizations I should say and I go down there by 5, 5:30, sit down with the different clinics and I help those girls to do a prior authorization, basically and, what I do is like, I see why it's not covered and what the patient was earlier taking. Based on that we request, basically most of them went through, when I said compliance and upper GI issues. But other than that, we always put, I always put, 'there it is a complication of having a secondary fracture' so, that, I think that's the wordings which basically makes me a win-win here and out of almost like 24 prior authorizations, 25 prior authorizations I have done in these two days, almost like 18, 19 have gone through.

This voicemail was subsequently forwarded across the country through Regional Sales Directors Sirine Tabbara and Mike Koellhoffer as a "success story" to be emulated by other sales representatives. Polani's district manager, Tim Garcia commented: "[T]here's many different things you can put on the prior authorizations to get them approved, such as compliance, GI

tolerability and GI tolerability [repetition in original] so, great job Mo." RSD Sirine Tabbara, also complementary, added that sales representatives and office staff should handle the fabrication of reasons for Atelvia's medical necessity: "Doctors should not get involved in this. They should know nothing about the process or what they need to do." RSD Koellhoffer stated:

> There is really nothing that stops any rep from doing what he is doing, except their own personal passion to win. So this is a case of a guy who is completely focused on driving his business to the top and willing to do what it takes to make that happen.

As Polani himself had done, Koellhoffer attested to the success of the fraudulent submissions at obtaining reimbursements for Atelvia: "He's talking here about his ability to get 18 out of 25 prior authorizations approved in 24 hours…." As a result, Polani was the second-ranked Atelvia sales representative in the country.

228.    At the beginning of February 2011 senior managers including RSD Koellhoffer sent a series of voicemail across the country touting sales representatives' participation in falsification of prior authorization requests as best practices. President Reichel himself advocated that such participation should be a "core competency" of Warner Chilcott sales representatives.

229.    On February 14, 2011, DM Craig Ott sent an email to sales representatives in his district listing "some verbiage that can be used on [prior authorization] forms." Clearly indicating that sales representatives were expected to instruct office staff to use Ott's language on prior authorization requests, Ott further labeled his list, "Examples of rationale for exception for office staff to include on Coverage Determination Form."

230.    RSD Koellhoffer described managed care as a barrier to Atelvia sales, and requested to know how many sales representatives, by a show of hands, had used the Medicare Part D prior authorization form in the field to overcome this barrier. All the hands in the room went up. Gary Rojewski instructed the representatives that if they were not using the Medicare

Part D prior authorization form, they should be. Mark Ritter told the sales representatives that if they needed prior authorization forms for other payors, they should speak to their district managers, who would obtain the forms for them.

231.    In sum, Warner Chilcotts's prior authorization manipulation scheme caused more Atelvia and Actonel prescriptions to be written when the drugs were not routinely included on PDP's forumlaries (and where a much cheaper alternative was on the formulary), causing injurious overpayments for MAOs.

**Scheme 3 - Unlawful Promotion of Actonel as "Clinically Superior" to Generics**

232.    Warner Chilcott discouraged a "scientific sell" of its drugs to health care professionals. Instead, the FCA Relators described how Warner Chilcott CEO Boissonneault instructed managers during a meeting in Puerto Rico in November 2010 that sales representatives should "keep it simple" and "sell on relationships" to health care professionals and their staffs. Thus, rather than promoting its drugs based on clinical merit, Warner Chilcott relied on a combination of inducements and misleading promotional claims.

233.    Most pharmaceutical companies employ Medical Science Liaisons ("MSLs") or an equivalent position in order to convey detailed medical-scientific information to inquiring health care professionals. Most have an advanced scientific degree such as an MD, PhD, or PharmD, allowing them to engage in sophisticated discussions with health care professionals regarding their employers' drug products. Frequently this means responding to health care professionals' requests for more information about a product, such as a drug's effectiveness for an off-label indication.

234.    As of December 2011, Warner Chilcott employed no MSLs, having fired the MSL's it had inherited through one of its corporate acquisitions.

235. Warner Chilcott instead relied on its sales representatives to convey any scientific information a physician might request. This is particularly surprising given that managers expressly discouraged sales representatives from discussing detailed scientific information, and that representatives possessed no advanced medical or scientific training and frequently lacked even a basic scientific understanding of their products.

236. As replacements for qualified MSLs, sales representatives were trained to make unsubstantiated product claims, exaggerating the efficacy and superiority of Warner Chilcott's products, including Actonel.

237. As the U.S. Attorney in Boston explained at Warner Chilcott's sentencing hearing:

> … towards the end of 2010, [for] Actonel, which was also an osteoporosis drug, [the] predecessor drug to Atelvia, the directors and executives for the company came up with a new marketing message for Actonel, and the new marketing message was that the sales force should promote Actonel as clinically superior to other bisphosphonates, and the reason for that was its supposed mechanism of action, the way the drug interacts with the body. There was a retrospective study that hypothesized that the mechanism of action for Actonel may be superior to other drugs and might explain why it works well, but there was no head-to-head study, there was no clinical proof that this was the case.
>
> Nevertheless, the sales force was instructed to go out to doctors and tell them that Actonel was superior to other bisphosphonates based on its mechanism of action. It included a visual depiction involving pouring syrup over a sponge that had not been approved by the FDA. There was no evidence ever presented to the FDA or anyone else that this mechanism of action message was, in fact, true, and so that's the third bucket, an unlawful promotion aspect of the healthcare fraud scheme . . . .
>
> Transcript at 15:3 – 24

238. As set forth by the FCA Relators, in order to ensure that sales representatives' promotions comply with FDA regulations, most pharmaceutical manufacturers have strict rules that limit which clinical studies sales representatives are allowed to promote and distribute. Generally, these companies only approve sales representatives' use of rigorous and well-

designed studies, which are then specially prepared for distribution to health care professionals by including a warning about any content that falls outside the drug's label, and by enclosing a copy of the Prescribing Information. FDA regulations allow sales representatives to promote studies pertaining to on-label uses; they are only allowed to distribute, not discuss, those pertaining to off-label uses.

239.    In contrast, Warner Chilcott had no such approval process, either for on- or off-label studies, and had not provided reprints for representatives to use in detailing. Instead, Warner Chilcott encouraged representatives to simply go on the internet, download, and print studies to share with health care professionals. District managers did the same, locating studies on the internet and then sending them via email to their sales representatives. Frequently, at POA meetings, representatives and their manager role played using these studies in mock off-label promotional details. This practice was a key part of Warner Chilcott's promotion of Actonel. Senior managers were not only been aware of the use of such studies for the off-label and misleading promotion of Warner Chilcott's drugs, they actively supported it.

240.    21 CFR 314.81(b)(3) requires pharmaceutical manufacturers to submit all promotional materials for a drug to the Office of Prescription Drug Promotion ("OPDP"), formerly the Division of Drug Marketing, Advertising and Communications ("DDMAC"), at the time of the materials' initial publication or dissemination. OPDP reviews the materials to ensure compliance with FDA regulations, including that they are truthful, balanced, and non-misleading.

241.    Warner Chilcott violated this requirement by not submitting its marketing pieces to OPDP or, previously, DDMAC. Indeed, President Reichel told employees that until Warner Chilcott received an OPDP Warning Letter, it would continue its illegal promotional practices.

### *Further Specific Examples of False Actonel Superiority Claims*

242.     As the FCA Relators stated, the greatest competitors to Actonel were its fellow oral bisphosphonates, foremost among which was generic Fosamax (alendronate) and Boniva (ibandronate). In order to maintain and gain market share, Warner Chilcott trained sales representatives to make a series of unsubstantiated superiority claims. While the claims were varied in form, they were misleading without exception. Warner Chilcott's misleading superiority claims caused health care professionals to prescribe and MAOs to reimburse for Actonel, when cheaper competitors such as generic Fosamax were just as medically appropriate.

243.     As one example, in early 2010, warnings increased that long-term use of oral bisphosphonates, including Actonel, had been associated with atypical femoral fractures. Rather than acknowledging this safety risk, Warner Chilcott sought to "spin" it against competitors by claiming that Actonel posed less risk than other oral bisphosphonates. There was no reliable scientific basis for that claim.

244.     Although for years health care professionals had engaged in widespread prescribing of bisphosphonates for the long-term prevention and treatment of osteoporosis, beginning in 2005, a growing number of reports emerged that some women taking bisphosphonates for many years suffered an unusual fracture of the femur. The reports indicated these cases involved little or no trauma; in most cases the women were simply standing or walking when the femur snapped. In some women, breaks occurred in both thighs. Many of the fractures were unusually slow to heal. Since that time, a number of experts have questioned the benefits of long-term use and the potential merits of "drug holidays." *See, e.g.,* Jane E. Broday, *Revisiting Bone Drugs and Femur Fractures*, N.Y. Times, Mar. 6, 2011, http://www.nytimes.com/2011/03/08/health/08brody-bone.html.

245.    Warner Chilcott claimed that Actonel and Atelvia posed less risk than other oral bisphosphonates. To do so, sales representatives compared bone suppression data from the Prescribing Information for Actonel and Fosamax, and claimed that the higher rate of bone turnover in the Actonel Prescribing Information implied a decreased risk of atypical fracture. Sales representatives claimed that Fosamax suppressed bone to such an extent that it causes "frozen bone," whereas Actonel led to higher bone turnover closer to the pre-menopausal rate. "Therefore, if you prescribe generic Fosamax, your patients will be much more likely to suffer an atypical femur fracture than if you put them on Actonel," they told health care professionals. Sales representatives were trained to support this assertion by claiming:

> Doctor, you have expressed concern about atypical femur factures. I have some data that will help put you at ease. Doctor, simply compare the package inserts of these two products. Actonel has higher bone turnover; thus, it is creating healthier bone. Doctor, this means that a patient on Actonel is less likely to suffer an atypical femur fracture than a patient on Fosamax. Doctor, why not prescribe Actonel, the safest bisphosphonate for your patients?

This claim was doubly misleading: not only did it rely on a non-head-to-head comparison, potentially introducing bias from differing patient populations and study methods, it also made a speculative leap from a single clinical marker (turnover rate) to clinical outcome (fracture risk), even though a multitude of factors influence that connection

246.    In an October 28, 2010 email forwarded across the country by RSD Koellhoffer, District Manager Brent Kimble reminded sales representatives that, should a physician express concern about atypical femur fractures, it would be a "great opportunity to differentiate Actonel from the competition" by comparing package inserts regarding the half-life of the drugs. The supposition was that the drug with the shorter half-life would result in less fragile bone and therefore greater efficacy. There is no data to support this theory, which requires a significant number of speculative leaps. In his e-mail, however, Kimble stated: "Keep in mind the Actonel

half life vs. Fosamax." Attached to the e-mail was an off-label, unapproved commentary intended for use in the field: Statement by National Osteoporosis Foundation Regarding Use of Bisphosphonates (National Osteoporosis Foundation, Washington, D.C.), Mar. 11, 2010. Kimble's email, forwarded through Koellhoffer, made clear that misleading superiority claims regarding Actonel's safety risks were not limited to Relator Alexander's district but were espoused nationwide.

247.    Beginning in early 2010, Warner Chilcott used the "MOA Study" to claim that Actonel conferred faster acting and more complete vertebral and non-vertebral protection than competing oral bisphosphonates.    R.G.G. Russell et al., *Mechanisms of Action of Bisphosphonates: Similarities and Differences and Their Potential Influence on Clinical Efficacy*, 19 Osteoporosis International 733 (2008) (referred to internally as the "Mechanism of Action Study" or "MOA Study"). The MOA Study was not a clinical trial: it did not enroll any patients or measure any clinical outcomes. Rather, it was an examination of the varying mechanisms of action of bisphosphonates, based on which it then speculated as to clinical implications.

248.    Of the four listed authors, three disclosed having received speaking honoraria, consulting fees, and research support from Procter & Gamble, which owned Actonel at the time. The fourth author was an employee of Procter & Gamble. Given the considerable degree of authorial discretion that exists in drawing connections between a drug's mechanism of action and its supposed clinical implications, the apparent bias of the authors is particularly relevant in this case — even more so than in a clinical trial where outcome measures tend to be more objective, as well as predefined. Nonetheless, Warner Chilcott did not disclose this bias as part of sales representatives' details.

249.    At a POA meeting in Chicago on July 14, 2010, Osteoporosis sales representatives were trained to make two separate superiority claims based on the MOA Study's conclusions. First, their managers demonstrated and sales representatives practiced role plays using the MOA Study to claim that Actonel had the "lowest affinity" for the bone of any oral bisphosphonate, and as a result, that Actonel offered more complete vertebral and nonvertebral fracture protection than competing bisphosphonates:

> Doctor, what this means to you and your patients is that Actonel has a less "sticky" design compared to Fosamax® and Boniva®, which provide very little skeletal protection. Boniva® has only been proven to work at the spine, whereas Actonel is able to "coat" the entire skeleton, thus providing your patients with total body non-vertebral fracture protection.

250.    Second, sales representatives practiced role plays claiming, based on the MOA Study, that Actonel had the "highest potency" of any oral bisphosphonate:

> Doctor, what this means for you and your patients is that as a result of this high potency, Actonel will be that fastest acting bisphosphonate. With Actonel, your patients will see vertebral and nonvertebral fracture protection in as little as six months. Boniva and Fosamax® can take years to work.

251.    At the direction of their managers, sales representatives practiced closing their calls by saying: Doctor, as a result of the design of the Actonel molecule, Actonel will give you the most complete fracture protection in the quickest amount of time.

252.    On October 10, 2010, RSD Koellhoffer forwarded an email chain from sales representative Dana Miller and District Manager Brent Kimble across the country. In the original email, Kimble recapped her attendance at the 41st Annual Rheumatology Symposium where she spoke with Dr. Nelson Watts. In doing so, Miller and DM Kimble both confirmed that "affinity and potency" (the "MOA story") were being promoted as Warner Chilcott's primary Actonel sales message in the field with health care professionals. DM Kimble stated: "Dr. Watts also

spoke to the need for moderate affinity and high potency which is exactly the same message we have been conveying to our customers" (emphasis added).

253.    Shannon Schneider, a former P&GP sales representative from LaCrosse, Wisconsin, who was responsible for selling Warner Chilcott's drugs in Wisconsin and Minnesota, raised concerns for nearly a year with her district manager, Craig Ott, that using unapproved studies such as the MOA Study was illegal. Ott not only refused to merit her concerns, he berated her for raising them. During a ride along with Schneider a physician asked to see the clinical support for Warner Chilcott's affinity and potency claims, and DM Ott told the physician that Schneider would get him a copy. When they left the doctor's office, Schneider again raised her concern that the MOA Study was unapproved and was being used to promote Actonel off-label. Again, DM Ott berated her, at which point she raised her concerns with Ott's manager, RSD Koellhoffer. Schneider was later told that using downloaded, unapproved studies had been "approved" by Warner Chilcott.

254.    Beginning in July 2010 and continuing through December 2010, Warner Chilcott trained sales representatives to make superiority claims based on three additional studies. None of these studies was adequately designed or of sufficient quality to support Warner Chilcott's superiority claims, which were unsubstantiated and misleading.

255.    Sales representatives first received official training on the studies at a POA meeting in Chicago on September 28-30, 2010, although by that point sales representatives had already been "unofficially" using the off-label studies for two months. On September 24, 2010, DM Johnson forwarded the email for her district to legacy P&GP representatives Peter Zimmerman, John Payne, and Relator Alexander, attaching the Adachi, REAL, and Ringe Studies. Johnson informed them that the POA meeting would include role play exercises

incorporating the REAL, Adachi, and Ringe Studies into their promotions, and that participants would include not only the Midwest region but sales representatives from across the country as well. The RSDs approved this agenda.

256.     Warner Chilcott also used the "Real Study 18."   R.L. Silverman *et al.*, *Effectiveness of Bisphosphonates on Nonvertebral and Hip Fractures in the First Year of Therapy*: *The Risedronate and Alendronate (REAL) Cohort Study*, 18 Osteoporosis International 25 (2007).  In a voicemail message forwarded by DM Julie Johnson on October 15, 2010, sales representative Jessica Rosignal described her success using the "REAL Study 318" and MOA Studies to convince a physician to prescribe Actonel instead of generic Fosamax: "So I talked a little about the MOA story with him … [b]ut what really sealed the deal was talking about the REAL study…." The physician called the pharmacy and notified the patient while Rosignal was still in the office. At the meeting, sales representatives were trained to and practiced promoting the REAL Study as evidence that Actonel had a proven 43% lower hip fracture rate than branded Fosamax. Given that the REAL Study was a cohort study, it was subject to significant bias and not adequate evidence upon which to make this claim. Nonetheless, managers instructed sales representatives to go a step further, and since the REAL Study examined branded Fosamax, to claim that Actonel's advantage versus generic Fosamax would be even greater than that demonstrated in the REAL Study.

257.     Another improper study was the "Adachi Study 320."  Daniel T. Grima *et al.*, *Adverse Events, Bone Mineral Density and Discontinuation Associated with Generic Alendronate Among Postmenopausal Women Previously Tolerant of Brand Alendronate: A Retrospective Cohort Study*, 11 BMC Musculoskeletal Disorders 68 (2010).  The Adachi Study was a retrospective cohort study, which followed 301 patients who switched from branded to

generic alendronate and compared the incidence of certain adverse events and clinical outcome measures prior to and following the switch.  Warner Chilcott trained sales representatives to promote that patients taking generic alendronate (such as Fosamax) experienced significantly lower bone mineral density ("BMD") and a four-fold increase in gastrointestinal problems when switched from a branded alendronate such as Actonel. The four-fold figure was calculated based on a discontinuation rate of 79% due to gastrointestinal problems among patients on generic versus a 21% among those on branded, meaning a 3.76-fold increase. VP Koellhoffer directed sales representatives to round this figure up to four, and to claim that the higher gastrointestinal side effects of the generic led patients to discontinue therapy at a four-fold rate compared to branded.

258.    In addition, sales representatives were trained to claim that generic versions of alendronate would vary widely in their dissolution time, from 2 to 10 times faster to 5 times slower than their branded counterparts. Slower dissolution, managers told sales representatives, would lead to increased drug exposure and toxicity, causing generic alendronate to result in significantly more gastrointestinal side effects than branded Actonel.  Alternatively, sales representatives were to claim that faster disintegration would result in the generic tablet coming into contact with food or beverage, resulting in reduced absorption and compromised fracture protection. Thus, the message was that Actonel would provide superior fracture protection compared with generic alendronate.  However, there was no parallel cohort that remained on branded alendronate; all patients switched, and the study simply compared events in one time period versus the other. Given that a decline in bone mineral density over time would not be unexpected in a group of patients diagnosed with osteoporosis, the study's attribution of this decline to the switch to generic alendronate is questionable.

259.    Not only were none of these claims supported by reliable clinical evidence, Actonel was not even included in the Adachi Study: its comparisons were all between various forms of alendronate.

260.    Another wrongly used study was the Ringe Study.   Johann Ringe *et al.*, *Differences in Persistence, Safety and Efficacy of Generic and Original Branded Once Weekly Bisphosphonates in Patients With Postmenopausal Osteoporosis: 1-Year Results of a Retrospective Patient Chart Review Analysis*, 30 Rheumatology International 213 (2009). The Ringe Study was a retrospective chart review of 186 patients, and as such, subject to the potentially significant biases inherent in non-randomized studies. Sales representatives were trained to use the Ringe study to promote that generic alendronate was clearly inferior to Actonel because it resulted in five times more gastrointestinal side effects. This figure was calculated based on 32 patients on generic alendronate with gastrointestinal side effects divided by 9 patients on branded Actonel with gastrointestinal side effects, which equals a 3.4-fold increase. RSD Koellhoffer again told representatives to "round up" to four- or five- times greater gastrointestinal side effects. As was Warner Chilcott's standard promotional strategy, managers instructed representatives to "keep it simple" and tout that Actonel had 40% to 50% lower BMD builds than generic alendronate, despite the lack of reliable clinical evidence for these claims.

261.    A final improperly used study was the Sook-Bin Woo Study.  Sook-Bin Woo *et al.*, *Systematic Review: Bisphosphonates and Osteonecrosis of the Jaws*, 144 Annals of Internal Medicine 753 (2006).   Sales representatives received the Sook-Bin Woo Study in 2010. Although it was marked "Sales Training" and "Background Information Only," Warner Chilcott trained and instructed sales representatives to use the study in their details with health care professionals to: (a) minimize physician concerns about osteonecrosis of the jaw; (b) point out

that most patients who experienced osteonecrosis of the jaw were cancer patients undergoing treatment and taking intravenous bisphosphonates like Reclast; and (c) point out that in this study, there was only one reported case of osteonecrosis of the jaw with Actonel compared to thirteen reported cases with Fosamax. Representatives were trained to conclude: "Doctor, bottom line, if you are concerned about osteonecrosis of the jaw, Actonel is clearly the least likely to cause this side effect in your patients."  No head-to-head data supports this claim.

262.    A number of sales representatives raised concerns regarding this off-label superiority message in front of Warner Chilcott's upper management. For example, sales representative Steven Justice asked how sales representatives could use unapproved studies to detail health care professionals and make superiority claims. DM Johnson and RSD Koellhoffer wrongfully responded that sales representatives were allowed to talk to doctors about any information or study that the doctors could themselves locate on the internet.

263.    As a result of Warner Chilcott's pervasive scheme to promote sales of Actonel based on fraudulently and illegal superiority claims, doctors were induced to prescribed Actonel instead of cheaper, similarly effective generic alternatives, causing injury to MAOs who paid for the higher priced Actonel.

**Factual Summary**

264.    Warner Chilcott's fraudulent marketing scheme were developed and implemented by Warner Chilcott's senior executives and managers, among whom Dermatology Director Nicola Crawford, Osteoporosis Director Lenny Paolillo, Women's Health Care Director Marc Moskowitz, Regional Sales Director Mike Koellhoffer, and President of Pharmaceuticals Carl Reichel were some of the most vigorous proponents. Management made participation in Warner

Chilcott's scheme of kickbacks, falsification of prior authorization requests, and misleading promotional claims core requirements of both sales representatives and managers' employment.

265.    Not even receipt of a subpoena, announced in Warner Chilcott's Form 10-K filed on February 24, 2012, caused Warner Chilcott to stem its illegal sales practices. In response to an analyst's question regarding the Government's investigation during an earnings call in February 2012, CFO Herendeen responded: "[I]t's something that, if you in this business, it happens." He reiterated, "You know, it happens." Transcript, Q4 2011 Warner Chilcott PLC Earnings Conference Call – Final (Feb. 24, 2012), available at LEXIS FD (Fair Disclosure) Wire.

### Warner Chilcott Conspired with High-Prescribing Health Care Professionals to Defraud Medicare and MAOs

266.    One facet of Warner Chilcott's schemes involved utilizing high-prescribing health care professionals to further the overall fraudulent marketing of Warner Chilcott drugs through a pattern and practice of false and misleading promotion, and payment of kickbacks ("overt acts").

267.    Warner Chilcott entered into unlawful financial arrangements with high-prescribing health care professionals in exchange for those health care professionals' writing prescriptions that were submitted to and paid for by Medicare and MAOs. Warner Chilcott executives and sales managers directed Warner Chilcott's sales force to gain the agreement of these high-prescribing health care professionals to prescribe Warner Chilcott's products in exchange for different forms of unlawful remuneration.

268.    Warner Chilcott entered into written agreements including "Master Speaker Services Agreements" and "Preceptorship Agreements," through which it funneled monies in furtherance of the conspiracies, with each of these high-prescribing health care professionals, including those listed herein.

269.    The overt acts included the submission to Medicare and MAOs by these high-prescribing health care professionals of knowingly false certifications of compliance with laws that are conditions of Government Program payments.  As a result of these false certifications, Government Programs made payments to pharmacy providers, thereby increasing sales of Warner Chilcott's drugs.

270.    In exchange for the unlawful financial remuneration these health care professionals and their staffs received from Warner Chilcott, their patients, who at the time were Medicare beneficiaries, were unlawfully referred to Warner Chilcott's drug products.

271.    Warner Chilcott and its co-conspirator health care professionals shared in the conspiratorial objective to prescribe Warner Chilcott drugs, and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of Warner Chilcott's scheme to target and financially injure Medicare and MAOs. Accordingly, Warner Chilcott entered into these unlawful financial relationships for the purpose of Defendants' planned scheme to target Medicare (and MAOs) and submit or cause the submission of false or fraudulent claims and records.

272.    Warner Chilcott corrupted the prescription drug dispensing process with its multimillion dollar incentive programs that targeted doctors who, in exchange for illegal kickbacks, steered patients toward its drugs. Such payments by Warner Chilcott to these health care professionals are kickbacks and are not legitimate marketing and educational practices, but instead represent the corruption of the practice of medicine motivated by financial gain.

273.    Defendants intentionally conspired with one or more of these health care professionals to get a false or fraudulent claim allowed or paid by the United States; one or more

of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

### The Qui Tam Case

274.    As previously described above, on March 30, 2011, an FCA *Qui Tam* Complaint was filed against the Defendants, principally Warner Chilcott Sales US, in the District of Massachusetts alleging four counts of violations of the Federal FCA and numerous violations of state counterparts.

275.    The Complaint alleged essentially the same allegations and actions as those alleged herein.

276.    On October 29, 2015, the Relator, the United States and Defendant, Warner Chilcott, entered into a Settlement Agreement.

277.    Defendant agreed to pay $112,642,306.00 to resolve the false allegations raised by the *Qui Tam* Comlaint.

278.    The Settlement Agreement included the actions related to the following drugs, Actonel, Asacol, Asacol HD, Atelvia, Doryx, Enablex, Estrace, Loestrin 24 Fe, and Lo Loestrin.

### The Criminal Health Care Fraud Case

279.    Also as previously described above, on October 29, 2015, the Department of Justice filed a criminal Information for Health Care Fraud (18 U.S.C. § 1347) against Defendant.

280.    The Information included allegations relating to Defendant's knowingly and willfully executing a scheme and artifice to defraud Medicare by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items and services in violation of 18 U.S.C. § 1347(2).

281.    These violations were enumerated in the one charge of heathcare fraud against Defendats, which was comprised of the three-part scheme outlined above, and Warner Chilcott admitted to the essential elements of each prong of the scheme, and was sentenced on April 15, 2016.

## TOLLING OF THE STATUTE OF LIMITATIONS

### DISCOVERY RULE TOLLING

282.    Plaintiffs had no way of knowing about the Defendants' scheme and deception with respect to the Warner Chilcott scheme.

283.    Warner Chilcott refused to disclose the scheme labeling them trade secrets, hence a reasonable plaintiff and consumer could not discover the truth.

284.    Within the time period of any applicable statutes of limitation, plaintiffs and members of the proposed class could not have discovered through the exercise of reasonable diligence that the defendants were concealing the conduct complained of herein and misrepresenting the nature of Warner Chilcott's scheme.

285.    Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that the defendants were engaged in the overall scheme and were committing the above mentioned individual schemes, nor would a reasonable diligent investigation have disclosed the true facts.

286.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

## FRAUDULENT CONCEALMENT TOLLING

287.   All applicable statutes of limitation have also been tolled by the defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

## ESTOPPEL

288.   The defendants were under a continuous duty to disclose to plaintiffs the true nature of the schemes upon which payments for the Warner Chilcott's payments were based.

289.   Based on the foregoing, the defendants are estopped from relying on any statutes of limitations in defense of this action.

## <u>CLASS ALLEGATIONS</u>

290.   Plaintiffs brings this action on behalf of itself and the following classes:

Class 1: Entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") or their assignees pursuant to Medicare Part C, who purchased, paid, provided reimbursement, and/or possess the recovery rights to reimbursement, for some or all of the purchase price of Defendants' Warner Chilcott Products pursuant to Medicare Part C contracts offering Medicare Parts A and Part B services from January 1, 2009, to present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; and (c) any judges or justices involved in this action and any members of their immediate families.

Class 2: Entities that contracted directly with the Centers for Medicare and Medicaid Services ("CMS") or their assignees pursuant to Medicare Part D, who purchased, paid, provided reimbursement, and/or possess the recovery rights to reimbursement, for some or all of the purchase price of Defendants' Subsys pursuant to Medicare Part D contracts providing services from January 1, 2011, to present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities

with self-funded prescription drug plans; and (c) any judges or justices involved in this action and any members of their immediate families.

291.    Plaintiffs brings this action pursuant to Federal Rule of Civil Procedure 23 both individually and on behalf of all MAOs who have contracted with CMS to provide coverage for thousands of beneficiaries and all other individuals similarly situated which claims have been assigned to Plaintiffs that comprise (a) national injunctive class and/or (b) national damage classes and/or (c) various state-wide damage sub-classes, during the period from January 1, 2009, to the present.

292.    As discussed in this Class Action Complaint, Defendants have enjoyed ill-gotten gains from the sales of Warner Chillcott's Products at the expense of individual beneficiaries and Class Members suffering damages to their property and business.  Such damages apply to all individual Class Members (and Plaintiffs as the rightful assignee of those organizations that assigned their rights to Plaintiffs).  Class action law has long recognized that, when a company engages in conduct that has uniformly harmed a large number of claimants such as Plaintiffs, other third-party payers, and consumers, class resolution is an effective tool to redress the harm.

293.    Here, the Class Members have been deprived of property and money by being caused to purchase prescriptions of Warner Chilcott's products due to and as a direct result of Defendants engaging in racketeering activity as alleged throughout this Complaint.

294.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

Numerosity:  Numerous MAOs assigned their rights to Plaintiffs,

individual MAOs represent thousands of beneficiaries, that

purchased Warner Chillcott's products throughout the United States. The MAOs were forced to pay for Warner Chilcott's products when Defendants were falsifying forms and violating the AKS and FCA. Thus, the numerosity element for class certification is met.

Commonality:  Questions of law or fact are common to all members of the Class. Defendants' illegal pattern of racketeering activity and unlawful conduct having a common, adverse effect on all purchasers of Warner Chillcott's products, specifically, MAOs, who were left without an option but to pay Defendants' illegally obtained bills due to Defendant's unlawful scheme. Therefore, common questions of law or fact are prevalent throughout the class, i.e., whether Defendants engaged in a pattern of racketeering activity and conspired to provoke MAOs into paying for illegally prescribed Warner Chillcott products. Each Class Member shares the same needed remedy, i.e., reimbursement for unlawfully paid bills and lost money due to the Defendants' racketeering activity, disgorgement of the Defendants' profits from the illegal venture, and imposition of injunctive and equitable relief to stop Defendants from continuing in their activities.

Typicality:  Plaintiffs' claims are typical of the claims of the Class because their claims arise from the same course of conduct by Defendants, i.e., racketeering activity and unlawfully submitting

Warner Chillcott product bills for payment. Plaintiffs' Assignors paid or reimbursed for prescriptions of Warner Chilcott products where they would have not submitted payment as a consequence of Defendants' pattern of racketeering activity. Plaintiffs' claims are, therefore, typical of the Class.

Adequacy:   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Its interests in vindicating these claims are shared with all members of the Class. In addition, Plaintiffs is represented by competent and experienced counsel in class action litigation.

295.   The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior.  Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class.  Defendants deliberately conspired to submit Warner Chilcott product bills for payment that otherwise would have not been paid but for by Defendants engaging in a pattern of racketeering activity, thus depriving Plaintiffs' assignors of funds used to pay for the unlawfully submitted bills.

296.   The Class is also properly brought and should be maintained as a class action under Rule 23(b)(2) and (b)(3).  Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class. Additionally, Defendant's acted in such a way that questions of law or fact predominate over any questions affecting only individual members, and

that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

297.    Plaintiffs allege that they would have paid nothing for Warner Chilcott products if Defendants had not engaged in racketeering conduct.

## CLAIMS FOR RELIEF

### Count I
### VIOLATIONS OF 18 U.S.C. § 1962(C) AND (D)

298.    Plaintiff incorporates by referenece paragraphs 1 through 296 as if fully set forth herein.

299.    Plaintiffs bring this Count against Defendants, and John Does #1–100.

300.    At all relevant times, the Defendants have been "persons" under 18 U.S.C. § 1961(3) because they can hold, and do hold, "a legal or beneficial interest in property."

301.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

302.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

303.    As explained in detail above, Warner Chilcott sought to infiltrate the business arrangement established between John Does #1–100, as physicians placed under a duty to act in their patients best interests, health plans and pharmacies across the country through a fraudulent scheme designed to secure greater profits and market share for the Warner Chilcott Products and extract hundreds of millions of dollars of revenue from Plaintiffs' MAO assignors. As detailed below, the Warner Chilcott Defendants' misconduct violated § 1962(c).

304.    As evidenced by Warner Chilcott's sales strategy which led to Warner Chilcott being convicted of criminal Health Care Fraud by the Department of Justice, Warner Chilcott violated the AKS and other Medicare and FDA regulations.

*Description of the Warner Chilcott Enterprise.*

305.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

306.    For years, Physicians played the meaningful role in patient care, treating patients for their ailments and prescribing drugs, when necessary, based on efficacy and FDA authorized usages.

307.    However, starting in the 2000s and continuing into the 2010s Warner Chilcott began to exert unlawful influence in the physician-patient relationship by offering millions of dollars in illegal remunerations, or kickbacks, including speaking arrangements and lavish free meals wherein pharmaceutical product information was not discussed in any way other than in passing.

308.    Said speaking arrangements and free meals amounted essentially to nothing but social engagements having nothing to do with dissemination of pharmaceutical information.

309.    These speaking arrangements and dineers were done without any regulatory or compliance coordinators in attendance and many times with the sales person having little to no experience with health and regulatory laws.

310.    Warner Chilcott instituted into its regular business practice falsification of prior authorization requests usurping Plaintiffs assignor's formulary thereby causing Plaintiffs' assignors to pay full price for medications that were otherwise not authorized and fraudulent.

311.    Warner Chilcott also instituted into its regular business practice the unlawful promotion of is drugs through the use of unsubstantiated and illegal superiority claims.

312.    This comprehensive scheme of unlawful sales practice and promotion heavily benefited Warner Chilcott and Defendant John Does #1-100, by exponentially raising the volume of Warner Products sold, thereby increasing Warner Chilcott's revenue.    And with John Does #1-100 prescribing more Warner Chilcott Products, Warner Chilcott provided illegal kickbacks to those phsysicians.

313.    At all relevant times, Warner Chilcott, along with pharmacies, physicians, and sales persons, operated an ongoing association-in-fact enterprise. The sole purpose of this association-in-fact was ensuring that Warner Chilcott products were prescribed on an elevated basis, based on providing illegal remuneration to physicians, providing false superiority claims, and falsifying prior authorization requests to insurance companies to have the Warner Chilcott Products paid for by Plaintiffs' assignors.

314.    Defendant caused the submission of fraudulent payments based on certifications inherent in submitting bills for payment from any government healthcare program. These certifications include compliance with the AKS and the FCA.

315.    These actions constituted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

316.    At all relevant times, the Warner Chilcott Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities,

as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Warner Chilcott's profit-making scheme.

317.    The association-in-fact Warner Chilcott RICO Enterprise consisted of the following entities and individuals: (a) Warner Chilcott plc, its subsidiaries, executives, employees, and agents; (b) Actavis Pharma, Inc., its subsidiaries, executives, employees, and agents; (c) Allergan plc, its subsidiaries, executives, employees, and agents; and (d) John Does #1-100.

318.    While each of the Warner Chilcott RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the Warner Chilcott RICO Enterprise's affairs, at all relevant times, the Warner Chilcott RICO Enterprise: (a) had an existence separate and distinct from each Warner Chilcott RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the Warner Chilcott RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Warner Chilcott RICO Defendants, along with other individuals and entities, including unknown third parties.

319.    The Warner Chilcott RICO Defendants and their co-conspirators, through their illegal Warner Chilcott RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Warner Chilcott RICO Defendants and the other entities and individuals associated-in-fact with the Warner Chilcott RICO Enterprise's activities by illegal obtaining payment for Warner Products.

320.    Warner Chilcott orchestrated the Warner Chilcott RICO Scheme, whereby Warner Chilcott, as a manufacturer, leveraged its dominate position in the market by providing illegal remuneration to physicians that prescribed their products on an elevated basis.

321.    John Doe #1-100, physicians facilitated the Warner Chilcott RICO Enterprise by agreeing to prescribe Warner Products to obtain and maintain illegal remunerations from Warner Chilcott.

322.    In furtherance of the scheme, the Warner Chilcott RICO Defendants each affirmatively misrepresented or concealed the existence of the illegal remuneration scheme as well as the existence, amount, and purpose of the kickbacks given to physicians.

*The Warner Chilcott RICO Enterprise Sought to Fraudulently Increase Defendant Warner Chilcott's Profits and Revenues.*

323.    Each Warner Chilcott RICO Defendant benefited financially from the Warner Chilcott RICO Enterprise. Warner Chilcott received higher profits and revenues based on increased presriptions of the Warner Products.

324.    The John Doe #1–100 physicians profited by obtaining and maintaining illegal remunerations based on their level of prescribing Warner Products.

325.    The Warner Chilcott RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Warner Chilcott RICO Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to inflate the number of Warner Products prescribed by giving remunerations to prescribing physicians. Further, Warner Chilcott RICO Defendants committed wire fraud by submitting bills, using interstate wires, for payment that were not in compliance with the AKS and therefore amounted to FCA violations or Medicare fraud.

326.    The Warner Chilcott RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of

pharmaceutical products throughout the country, and the receipt of monies from the sale of the same.

327.     Within the Warner Chilcott RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Warner Chilcott RICO Enterprise used this common communication network for purposes of marketing, , and engaging in negotiations regarding Warner Products.

328.     Each participant in the Warner Chilcott RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the Warner Chilcott RICO Enterprise, the Warner Chilcott RICO Defendants functioned as a continuing unit with the purpose of furthering the Warner Chilcott RICO Scheme.

329.     The Warner Chilcott RICO Defendants participated in the operation and management of the Warner Chilcott RICO Enterprise by directing its affairs, as described herein. While the Warner Chilcott RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

330.     The Warner Chilcott RICO Defendants exerted substantial control over the Warner Chilcott RICO Enterprise, and participated in the affairs of the enterprise by: (a) kickbacks for the Warner Products described herein; (b) misrepresenting and/or concealing the existence, amount, or purpose of the kickbacks for the Warner Products described herein; (c) misrepresenting and/or concealing the effect that the off-label promotion of drugs had on prescriptions; (d) concealing the cost-sharing coupons given to Medicare beneficiaries in

violation of federal law; and (e) concealing the falsification of prior authorization requests that caused exorbitantly more expensive Warner Products to be purchased rather than cheaper products.

331.    Without each Warner Chilcott RICO Defendant's willing participation, the Warner Chilcott RICO Scheme and common course of conduct would not have been successful.

332.    The Warner Chilcott RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

*Predicate Acts: Mail and Wire Fraud.*

333.    To carry out, or attempt to carry out, the scheme to defraud, the Warner Chilcott RICO Defendants, each of whom is a person associated-in-fact with the Warner Chilcott RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the Warner Chilcott RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

334.    Specifically, the Warner Chilcott RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

335.    The multiple acts of racketeering activity which the Warner Chilcott RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Warner Chilcott RICO

Defendants' regular use of the facilities, services, distribution channels, and employees of the Warner Chilcott RICO Enterprise. The Warner Chilcott RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

336.   The Warner Chilcott RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

337.   In devising and executing the illegal scheme, the Warner Chilcott RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. To execute the illegal scheme, the Warner Chilcott RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

338.   The Warner Chilcott RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

> Mail Fraud: The Warner Chilcott RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to unlawfully sell Warner Products described herein by means of false pretenses, misrepresentations, promises, and omissions.
> Wire Fraud: The Warner Chilcott RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

339.   The Warner Chilcott RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of the Warner Products described herein; (b) the transmission of marketing

or other materials indicating or advertising that any of the Warner Chilcott RICO Defendants provide or receive illegal remuneration for the prescribing of Warner Products; (c) written, telephone, or electronic communications regarding and/or negotiating the kickback amount of the Warner Products described herein; (d) the transmission and/or distribution of the Warner Products described herein through the mails; and (e) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such Warner Products described herein.

340.   The Warner Chilcott RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

341.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the cost of Warner Products and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs.

342.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

343.   The Warner Chilcott RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the Warner Chilcott RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-

party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the Warner Chilcott RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

344.   The Warner Chilcott RICO Defendants aided and abetted others in the violations of the above laws.

345.   To achieve their common goals, the Warner Chilcott RICO Defendants hid from Plaintiffs, insurers, health plans, and the general public the illegal remunerations and false prior authorizations for the Warner Products and the relationship between the Warner Chilcott RICO Defendants and their impact upon Warner Products being prescribed herein, and the existence, amount, and purpose of remunerations given for the Warner Products described herein.

346.   The Warner Chilcott RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the Warner Chilcott RICO Defendants and their co-conspirators had to agree to conceal their fraudulent prior authorizations and sales tactics.

347.   The Warner Chilcott RICO Defendants knew, and intended that, Plaintiffs would rely on the material misrepresentations and omissions made by them and incur increased costs as a result. Indeed, if Plaintiffs did not make remunerations and false prior authorizations for the Warner Products described herein, the Warner Chilcott RICO scheme could not succeed.

348.   As described herein, the Warner Chilcott RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of

unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs based on their misrepresentations and omissions, while providing Warner Products that were prescribed due to violatins of the AKS. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

349.    During the Warner Chilcott RICO Defendants' speaker fees and dinner engagements, the true purpose of the renumerations were revealed to each of the Warner Chilcott RICO Defenants. Nevertheless, the Warner Chilcott RICO Defendants continued to disseminate misrepresentations regarding the Warner Products as well as the existence, amount, and purpose of the kickbacks on those products, in furtherance of the scheme.

350.    As a result of the conduct of the Warner Chilcott RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs has been injured in its business and/or property in multiple ways, including but not limited to paying for Warner Products despite the illegal actions by Warner Chilcott RICO Defendants described herein.

351.    The Warner Chilcott RICO Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs who is entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## Count II
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

352.    Plaintiffs incorporates by reference paragraphs 1 through 296 as if fully set forth herein.

## IDAHO CONSUMER PROTECTION ACT
## (IDAHO CODE ANN. § 48-6)

353.     Defendants are engaged in "trade or commerce" within the meaning of Idaho Code Ann. § 48-602 during all relevant periods by, at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in Idaho, to Plaintiffs, and throught the United States.

354.     Idaho Consumer Protection Act ("ICPA") prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantitites that they do not have or that a person has a sponsorhisp, approval, status, affiliation, connection, qualifications or license that he does not have;" and "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." Idaho Code Ann. § 48-603(5) and (17).

355.     As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of ICPA by perpetuating the fraudulent Warner Chilcott scheme as described herein.

356.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

357.     Defendants knew or should have known that their conduct was in violation of ICPA.

358.     Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and

Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of ICPA.

359.   Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

360.   Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the ICPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

361.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

362.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

363.   Plaintiffs are entitled to recover their actual damages under Idaho Code Ann. § 48-608 and attorneys' fees under Idaho Code Ann. § 48-608(5).

364.   Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the ICPA.

**TEXAS DECEPTIVE TRADE – CONSUMER PROTECTION ACT**

**(TEX. BUS. & COM. CODE §§ 17.41, *et seq*.)**

365.     Defendants are engaged in "trade or commerce" within the meaning of Tex. Bus. & Com. Code § 17.45 during all relevant periods by, at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in Texas, to Plaintiffs, and throughout the United States.

366.     Texas Deceptive Trade – Consumer Protection Act ("TDTCPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commere are hereby declard unlawful," Tex. Bus. & Com. Code § 17.46(a); TDTCPA states that false, misleading, or deceptive acts or practices includes "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantitites which they do not have or that a person has a sponsorshit, approval, status, affiliation, or connection which he does not." Tex. Bus. & Com. Code § 17.46(b)(5).

367.     As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of TDTCPA by perpetuating the fraudulent Warner Chilcott scheme as described herein.

368.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

369.     Defendants knew or should have known that their conduct was in violation of TDTCPA.

370.     Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts

regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of TDTCPA.

371.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

372.     Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the TDTCPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

373.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

374.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

375.     Plaintiffs are entitled to recover their actual damages under Tex. Bus. & Com. Code § 17.50(b)(1) and attorneys' fees under ex. Bus. & Com. Code § 17.50(b)(4)(d).

376.     Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the TDTCPA.

## North Carolina Unfair and Deceptive Trade Practices Act
### (N.C. Gen. Stat. § 75-1.1)

377.     Defendants are engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1 during all relevant periodsby, at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in North Carolina, to Plaintiffs, and throughout the United States.

378.     North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") prohibits [u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce..." N.C. Gen. Stat. § 75-1.1.

379.     As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of NCUDTPA by perpetuating the fraudulent Warner Chilcott scheme as described herein.

380.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

381.     Defendants knew or should have known that their conduct was in violation of NCUDTPA.

382.     Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and

Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of NCUDTPA.

383.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

384.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the NCUDTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

385.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

386.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

387.    Plaintiffs are entitled to recover their actual damages under N.C. Gen. Stat. § 75-16 and attorneys' fees under N.C. Gen. Stat. § 75-16.1.

388.    Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the NCUDTPA

## WEST VIRGINIA GENERAL CONSUMER PROTECTION ACT
### (W.V. CODE § 46A-6-101)

389.    Defendants are engaged in "trade or commerce" within the meaning of W.V. Code § 46A-6-102(6) during all relevant periods by, at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in West Virginia, to Plaintiffs, and throughout the United States.

390.    West Virginia General Consumer Protection Act ("WVGCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," W.V. Code § 46A-6-104; including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantitites that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have," and "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby." W.V. Code § 46A-6-102(7)(E) and (M).

391.    As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of WVGCPA by perpetuating the fraudulent Warner Chilcott scheme as described herein.

392.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

393.    Defendants knew or should have known that their conduct was in violation of WVGCPA.

394.     Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of WVGCPA.

395.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

396.     Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the WVGCPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

397.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

398.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

399.     Plaintiffs are entitled to recover their actual damages under W.V. Code § 46A-6-106.

400.    Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the WVGCPA.

## NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES ACT
## GEN. BUS. § 349

401.    Defendants are engaged in the conduct of any business, trade or commerce as delineated within Gen. Bus. § 349 during all relevant periods by, at a minimum advertising, offering for sale, and selling the Warner Chilcott products described herein in New York, to Plaintiffs, and throughout the United Staes.

402.    New York's Consumer Protection From Deceptive Acts and Practices Law ("NYCPL") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" Gen. Bus. § 349.

403.    As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of NYCPL by perpetuating the fraudulent Warner Chilcott scheme as described herein.

404.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

405.    Defendants knew or should have known that their conduct was in violation of NYCPL.

406.    Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and

Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of NYCPL.

407.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

408.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the NYCPL did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

409.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

410.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

411.    Plaintiffs are entitled to recover their actual damages and attorneys' fees under Gen. Bus. § 349(h).

412.    Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the NYCPL.

## MASSACHUSETTS CONSUMER PROTECTION ACT
## (MASS. GEN. LAWS CH. 93A)

413.     Defendants are engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b) during all relevant periods by, at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in Massachusetts, to Plaintiffs and throughout the United States.

414.     Massachusetts Consumer Protection Act ("MCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws ch. 93A, § 2(a).

415.     As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of MCPA by perpetuating the fraudulent Warner Chilcott scheme as described herein.

416.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

417.     Defendants knew or should have known that their conduct was in violation of MCPA.

418.     Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of MCPA.

419. Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

420. Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the MCPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

421. Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

422. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

423. Plaintiffs are entitled to recover their actual damages, plus treble those amounts, and attorneys' fees under Mass. Gen. Laws ch. 93A, §11.

424. Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the MCPA.

## INDIANA DECEPTIVE CONSUMER SALES
### (IND. CODE § 24-5)

425.    Defendants are engaged in "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2 during all relevant periods, by at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in Indiana, to Plaintiffs, and throughout the United States.

426.    Indinana Deceptive Consumer sales ("IDCS") prohibits "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction," Ind. Code § 24-5-0.5-3(a); these acts include "such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have." Ind. Code § 24-5-0.5-3(b)(1).

427.    As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of IDCS by perpetuating the fraudulent Warner Chilcott scheme as described herein.

428.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

429.    Defendants knew or should have known that their conduct was in violation of IDCS.

430.    Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of IDCS.

431.   Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

432.   Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the IDCS did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

433.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

434.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

435.   Plaintiffs are entitled to recover their actual damages under Ind. Code § 24-5-0.5-4(a) and attorneys' fees under Ind. Code § 24-5-0.5-4(b).

436.   Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the IDCS.

## FLORIDA DECPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, et seq.)

437.   Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) during all relevant periods by, at a minimum, advertising, offering for sale, and selling the Warner Chilcott products described herein in Florida, to Plaintiffs, and throughout the United States.

438.   Florida Deceptive Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce..." Fla. Stat. § 501.204(1).

439.   As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of FDUTPA by perpetuating the fraudulent Warner Chilcott scheme as described herein.

440.   Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

441.   Defendants knew or should have known that their conduct was in violation of FDUTPA.

442.   Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Warner Chilcott scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of FDUTPA.

443.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

444.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the Warner Chilcott products when they otherwise would not have paid for the products. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the FDUTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

445.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the Warner Chilcott products as described herein.

446.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

447.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

448.    Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## MINNESOTA PREVENTION OF CONSUMER FRAUD ACT

## (Minn. Stat. § 325f.68, et seq.)

449.    The Warner Chilcott products described herein constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

450.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1).

451.    As detailed above, Defendants engaged in deceptive acts in violation of the Minnesota CFA by perpetuating the Warner Chilcott scheme as described herein.

452.    Defendants owed and continue to owe Plaintiffs' Assignors a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme described herein.

453.    Defendants knew or should have known that their conduct was in violation of the Minnesota CFA.

454.    Despite knowing the true nature of their scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the scheme of the Warner Chilcott products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota CFA.

455.   Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

456.   Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay supracompetitive prices for the Warner Chilcott products when they otherwise would not have paid increased prices as set forth herein. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

457.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of supracompetitive prices of the Warner Chilcott products as described herein.

458.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest. Pursuant to Minn. Stat. § 8.31(3)(a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

459.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (Minn. Stat. § 325d.43-48, et seq.)

460.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, including the following enumerated actions, "(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" or " (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44.

461.    As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Minnesota DTPA by perpetuating the Warner Chilcott scheme as described herein.

462.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme as described herein.

463.    Defendants knew or should have known that their conduct was in violation of the Minnesota DTPA.

464.    Despite knowing the true nature of their scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the scheme of the Warner Chilcott products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota DTPA.

465.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

466.    Defendants' material misrepresentations proximately caused Plaintiffs to pay supracompetitive prices for the Warner Chilcott products when they otherwise would not have paid increased amounts. Because Defendants did not reveal the true nature of the Warner Chilcott  scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota DTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

467.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the Warner Chilcott products as described herein.

468.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

469.    Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

470.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

**THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. §§ 56:8-1, et seq.)**

471.    Plaintiffs and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

472.     Defendants are engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e).

473.     Defendants' actions as set forth herein occurred in the conduct of trade or commerce within the meaning of the New Jersey Consumer Fraud Act.

474.     The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. § 56:8-2.

475.     In the course of their business, Defendants engaged in unfair and deceptive practices in violation of the New Jersey CFA by perpetuating the Warner Chilcott scheme as described herein.

476.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Warner Chilcott scheme as described herein.

477.     Defendants knew or should have known that their conduct was in violation of the New Jersey CFA.

478.     Despite knowing the true nature of their scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the supracompetitive prices of the Warner Chilcott products described herein, with the intent to

mislead regulators, and Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the New Jersey CFA.

479.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

480.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay supracompetitive prices for the Warner Chilcott products when they otherwise would not have paid inflated prices. Because Defendants did not reveal the true nature of the Warner Chilcott scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the New Jersey CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

481.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the Warner Chilcott products as described herein.

482.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## COUNT III
## COMMON LAW FRAUD

483.    Plaintiffs incorporates by reference paragraphs 1 through 296 as if fully set forth herein.

484.    As alleged extensively above, Defendants affirmatively misrepresented and/or concealed and suppressed material facts concerning the following: (a) The true cost and/or price of the Warner Chilcott products described herein; (b) The inflated and/or fraudulent nature of the list price(s) set and/or charged by Defendants for the Warner Chilcott products described herein; (c) The existence, amount, and/or purpose(s) of discounts and/or rebates offered and/or negotiated by Defendants for those products; and (d) The role that Defendants' played in the price paid for the Warner Chilcott products described herein, including but not limited to marketing material averring that Defendants decrease the price of prescription drugs for consumers.

485.    Defendants valued their profits over the trust, health, and safety of Plaintiffs' beneficiaries and the other Class 1 and 2 Members who purchased Warner Chilcott products throughout the United States.

486.    Necessarily, Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Warner Chilcott Scheme to consumers, including Plaintiffs.

487.    Defendants' knowingly false representations and omissions were material to Plaintiffs.

488.    Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would rely on their misrepresentations.

489.    Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because they possessed exclusive knowledge regarding the nature of Warner Chilcott scheme, intentionally concealed the foregoing from Plaintiffs and the public, and made incomplete or negligent representations about the Warner Chilcott products and the Defendants' role in the

scheme, while purposefully withholding material facts from Plaintiffs and the other Class 1 and 2 Members that contradicted these representations.

490.    Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health.

491.    Defendants owed Plaintiffs a duty to disclose, truthfully, all the facts concerning the scheme of the Warner Chilcott products described herein and the inflated and fraudulent nature of their sales practices and the role that Defendants played in increasing the sale of the Warner Chilcott products described herein.

492.    Defendants hatched their deceptive schemes and knew that their customers, including Plaintiffs, did not know about (and could not reasonably discover) the manner in which Warner Chilcotts schemes increased their products sales.

493.    Defendants not only concealed all the facts concerning the scheme of selling Warner Chilcott products described herein, but went further to make affirmative misrepresentations in marketing materials and other communications that Defendants worked to increase the sales of Warner Chilcott products.

494.    Defendants engaged in this fraudulent concealment at the expense of Plaintiffs and the other Class 1 and 2 Members making such material misrepresentations in order to induce Plaintiffs and the other Class 1 and 2 Members to rely on such misrepresentations to their detriment.

495.    Plaintiffs and the other Class 1 and 2 Members were not aware of the concealed and misrepresented material facts referenced above, and they reasonably relied on Defendants' representations.

496.    Plaintiff's Assignors and members of the class would not have paid for Warner Chilcott products as they did had they known the true nature of Warner Chilcott's scheme.

497.    As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs sustained damages, including but not limited to paying excessive and inflated prices for the Warner Chilcott products described herein.

498.    Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

499.    Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COUNT IV
## UNJUST ENRICHMENT

500.    Plaintiffs incorporates by reference paragraphs 1 through 296 as if fully set forth herein.

501.    Defendants have benefitted from selling, setting prices for and taking part of the illegal scheme for Warner Chilcott products.

502.    Defendants have received and retained unjust benefits from the Plaintiffs, in the form of costs paid, copayments, and coinsurance payments, and inequity has resulted.

503.    It is inequitable and unconscionable for Defendants to retain these benefits.

504.    Because Defendants concealed their fraud and deception, Plaintiffs were not aware of the true facts concerning the Warner Chilcott  scheme described herein and did not benefit from Defendants' misconduct.

505.    Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

506.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully demands that this Court:

A.    Enter judgments against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

B.    Award preliminary and permanent injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs, including, inter alia, an order prohibiting Defendants from engaging in the unlawful acts described above.

C.    Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

D.    Award the Plaintiffs damages (i.e. three times overcharges) in an amount to be determined at trial;

E.    Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, the common fund doctrine, and applicable state law;

F.    Order that Defendants must notify each individual who paid a copayment or coinsurance for covered prescription drugs that in relation to the pendency of this action so that they may obtain relief from Defendants for their harm; and

G.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

507.    Pursuant to Fed. R. Civ. P. 38, Plaintiffs demands a trial by jury on all issues so triable.

DATED:  February 9, 2018                    **THORNTON LAW FIRM LLP**

                                            */s/ Marilyn McGoldrick*
                                            Marilyn McGoldrick (BBO #561766)
                                            100 Summer Street, 30th Floor
                                            Boston, Massachusetts  02110
                                            Telephone: (617) 720-1333
                                            Facsimile: (617) 720-2445
                                            mmcgoldrick@tenlaw.com

Christopher L. Coffin (LA Bar No. 27902)
Tracy L. Turner
**Pendley, Baudin & Coffin, LLP**
1515 Poydras St., Suite 1400
New Orleans, LA  70112
Tel: 504-355-0086
Fax: 504-523-0699
ccoffin@pbclawfirm.com
tturner@pbclawfirm.com

Enrique G. Serna
State Bar of Texas 00789617
Serna & Associates PLLC
10999 IH10 W
Suite 305
San Antonio, Texas 78230
210-472-2222 - Phone
210-228-0839 - Fax
enrique@serna-associates.com