UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC et al., <br><br> Plaintiffs, <br><br> v. <br><br> WARNER CHILCOTT PLC et al., <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> *    Civil Action No. 18-cv-10274-ADB <br> * <br> * <br> * <br> * <br> * |

## **MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiffs assert that they are the holders, by assignment, of the right to recover for damages that certain Medicare Advantage Organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), and other entities suffered as a result of Defendants' schemes to increase prescriptions for their pharmaceuticals by bribing doctors, making false efficacy claims, and manipulating the process for obtaining prior authorizations. [ECF No. 28 at 3–4 ("Second Amended Complaint" or "SAC")]. Plaintiffs bring claims on behalf of two putative classes of entities[1] that allegedly incurred costs as a result of Defendants' violations of the Racketeer

---

[1] Plaintiffs initially purported to represent a class of "[e]ntities that contracted directly with the Centers for Medicare and Medicaid . . . or their assignees pursuant to Medicare Part C, who purchased, paid, provided reimbursement, and/or possess the recover rights to reimbursement, for . . . Defendants' Subsys . . . ." [ECF No. 1 ¶ 290]. Subsys is not among Defendants' products. Plaintiffs eliminated the reference to Subsys in their First Amended Complaint, and instead asserted a putative class of entities who paid for or hold claims related to the purchase of Warner Chilcott Products. [ECF No. 11 ¶ 213]. In their Second Amended Complaint, Plaintiffs replaced the Warner Chilcott Products class with two classes of entities that incurred costs for "Defendants' blood glucose test strips." [SAC ¶¶ 231–33]. Plaintiffs' counsel acknowledges

Influenced and Corrupt Organizations Act ("RICO") (Count I), 18 U.S.C. §§ 1962(c) and (d), and violations of the consumer protection laws of Idaho, Texas, North Carolina, West Virginia, New York, Massachusetts, Indiana, Florida, Minnesota, and New Jersey (Count II),[2] as well as for acts of common law fraud (Count III), and based on unjust enrichment (Count IV). [See SAC ¶¶ 241–473]. Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF No. 31]. For the reasons explained herein, the motion is GRANTED. Plaintiffs' RICO claim is dismissed with prejudice, and the remaining state law claims are dismissed without prejudice.

## I.     BACKGROUND

The following facts are drawn from the Second Amended Complaint, the well-pleaded allegations of which are taken as true for purposes of evaluating Defendants' motion to dismiss. See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014). The Complaint spans 115 pages, and this summary is therefore restricted to pertinent facts.

Plaintiffs MSP Recovery Claims, Series LLC; MSPA Claims 1, LLC; and MAO-MSO Recovery II, Series PMPI (collectively "Plaintiffs") claim to hold, by assignment, the rights to recover damages for fraudulently-submitted prescriptions paid for by numerous MAOs, IPAs, MSOs, HMOs, and other Medicare downstream entities across the United States. [SAC ¶¶ 1–3]. The Second Amended Complaint identifies Fallon Community Health Plan, Inc., SummaCare,

---

that she forgot to replace the words "blood glucose test strips" with "Warner Products," and wishes to maintain a class action for damages associated with Defendants' products. [ECF No. 30 at 1 n.1]. The first putative class includes MAOs and related entities who incurred costs "pursuant to Medicare Part C and D contracts offering Medicare Part D services," while the second putative class includes "MAO MA-PD, or PDP sponsors and related entities" who incurred costs "pursuant to Medicare Part D contracts." [SAC ¶¶ 232–33].

[2] Tex. Bus. & Com. Code §§ 17.41 et seq.; N.C. Gen. Stat. § 75-1.1; W.V. Code § 46A-6-101; N.Y. Gen. Bus. Law § 349; Mass. Gen. Laws ch. 93A; Ind. Code § 24-5; Fla. Stat. §§ 501.201 et seq.; Minn. Stat. §§ 325d.43-48, 325f.68 et seq.; N.J. Stat. §§ 56:8-1 et seq.

Inc., Interamerican Medical Center Group, LLC, and Preferred Medical Plan, Inc. (collectively, "Assignors") as entities that assigned claims "whether based in contract, tort, [or] statutory right" to MSP Recovery LLC. [Id. ¶¶ A1–A4].[3] The Assignors allegedly incurred costs for Warner Chilcott Products pursuant to agreements with the Centers for Medicare and Medicaid Services ("CMS") or agreements with non-government entities that had taken on the risk of pharmaceutical costs from CMS. [Id. ¶¶ 26, 36; see also ECF No. 33 at 15].

Defendants Warner Chilcott PLC, Warner Chilcott Sales (US), LLC (together, "Warner Chilcott"), Allergan USA, Inc., Allergan Sales, LLC, Allergan GI, Corp., and Allergan plc (collectively, "Defendants")[4] are companies engaged in the discovery, development, manufacturing, marketing, and/or distribution of parametrical products in the United States and abroad. [SAC ¶¶ 4–11]. Defendants engaged in illegal schemes to increase purchases of their products, including Actonel, Atelvia, Asacol (400 mg), Asacol HD, Doryx, Enablex, Estrace Cream, Loestrin, and Lo Loestrin products (collectively, "Warner Chilcott Products"). [Id. at 3–4]. Actonel and Atelvia are osteoporosis drugs, [id. ¶ 95]; Asacol HD treats moderately active ulcerative colitis, which is a bowel disease, [id. ¶ 77]; Doryx treats certain bacterial infections and is used to prevent malaria, [id. ¶ 116]; Enablex treats overactive bladder, [id. ¶ 124]; Estrace Cream treats certain vaginal conditions, [id. ¶ 81]; and Loestrin and Lo Loestrin are contraceptives, [id. ¶ 81].

---

[3] Defendants have altered the asserted assignors through amendments without corresponding updates to their assertions and the exhibits. [See ECF No. 1-2; ECF No. 11 ¶¶ A1–77]. It is not clear that MSP Recovery's contract with Interamerican Medical Center Group, LLC includes this language, [see ECF No. 34 at 16–28], but the Court does not reach questions concerning the scope of the assignments.

[4] Plaintiffs also brought claims against Warner Chilcott Corporation, Warner Chilcott (US), LLC, and Actavis Pharma, Inc. Those entities (or former entities) have not appeared under those names. According to the Second Amended Complaint, Actavis acquired Warner Chilcott and Allergan, Inc., and has renamed itself Allergan. [SAC ¶ 4].

Warner Chilcott utilized three schemes to promote prescription of its drugs: (1) kickbacks through its Medical Education, or "MedEd," events and other gifts to reward and encourage the prescribing of Warner Chilcott Products; (2) manipulation of prior authorizations for Atelvia and Actonel, and (3) fraudulent promotion of Actonel as "clinically superior" to generics. [Id. ¶¶ 65–195]. Plaintiffs claim that Warner Chilcott engaged in these schemes to increase prescriptions of Warner Chilcott Products for both approved uses and unapproved or "off-label" uses. [Id. ¶¶ 40–50, 80, 115, 161, 177]; see 21 U.S.C. §355(a).

On March 30, 2011, two former employees of Warner Chilcott, James Goan and Lisa Alexander, filed a False Claims Act *qui tam* action on behalf of the United States as relators. See Complaint, United States ex rel. Alexander v. Warner Chilcott PLC, No. 11-cv-10545-RGS (D. Mass. Mar. 30, 2011), ECF No. 1. Their *qui tam* complaint was amended on November 19, 2012, ordered unsealed on January 3, 2013, and further amended on April 22 and August 22, 2013, see United States ex rel. Alexander v. Warner Chilcott PLC, No. 11-cv-10545-RGS (D. Mass), ECF Nos. 17, 22, 24, 45. The United States reported on January 2, 2013 that it was not intervening, but that its investigation was ongoing. See Amended Notice of the United States, United States ex rel. Alexander v. Warner Chilcott PLC, No. 11-cv-10545-RGS (D. Mass. Jan. 2, 2013), ECF No. 21. Although the action was ordered unsealed in January 2013, it appears that the *qui tam* complaint and United States' notice that it did not intend to intervene were not unsealed until March 5, 2013.[5] After several stays, Warner Chilcott agreed to pay $112,642,306.00 to resolve that *qui tam* action in 2015. [SAC ¶¶ 202–10]. The August 22, 2013

---

[5] The Court bases this conclusion on a court-only note on the docket and the timing of the ensuing press coverage. The parties have indicated, however, that the case was unsealed on January 3, 2013. [ECF Nos. 32 at 13; 33 at 11].

third amended *qui tam* complaint made the same factual allegations that are asserted here. [Id. ¶ 200].

On June 27, 2011, Relator Chris Wible, a sales representative at Warner Chilcott, filed a second *qui tam* action that also made similar allegations, although it was restricted to Warner Chilcott's promotion of Actonel and Asacol. Complaint, United States ex rel Wible v. Warner Chilcott, No. 1:11-cv-11143 (D. Mass. June 27, 2011), ECF No. 1. The United States also declined to intervene in that action, and the complaint was unsealed on February 21, 2013. Order, United States ex rel Wible v. Warner Chilcott, No. 1:11-cv-11143 (D. Mass. Feb. 21, 2013), ECF No. 19.

The *qui tam* actions were the subject of press attention. See, e.g., Daniel Wilson, Warner Chilcott Misbranded Drugs, FCA Kickback Suit Says, Law 360 (Mar. 8, 2013, 2:19 PM), https://www.law360.com/governmentcontracts/articles/421963/warner-chilcott-misbrandeddrugs-fca-kickback-suit-says. The actions were also disclosed by Warner Chilcott in its May 2013 10-Q. See Warner Chilcott PLC, Quarterly Report (Form 10-Q) 22 (May 10, 2013).

The *qui tam* actions, which proceeded simultaneously, resulted in subpoenas being issued to Warner Chilcott. Warner Chilcott disclosed the subpoenas in its May 2012 10-Q, which stated:

> In February 2012, the Company, along with certain non-executive employees in its sales organization, received subpoenas from the United States Attorney for the District of Massachusetts. The subpoena received by the Company seeks information and documentation relating to a wide range of matters, including sales and marketing activities, payments to people who are in a position to recommend drugs, medical education, consultancies, prior authorization processes, clinical trials, off-label use and employee training (including with respect to laws and regulations concerning off-label information and physician remuneration), in each case relating to all of the Company's current key products. The Company is

cooperating in responding to the subpoena, but cannot predict or determine the impact of this inquiry on its future financial condition or results of operations.

Warner Chilcott PLC, Quarterly Report (Form 10-Q) 20 (May 4, 2012). The government's investigation, which was also the subject of press attention,[6] culminated in Warner Chilcott's guilty plea to healthcare fraud on April 15, 2016. [SAC ¶ 218].

Plaintiffs filed this action on February 12, 2018. [ECF No. 1]. On July 25, 2018, Plaintiffs filed the Second Amended Complaint, which acknowledges that the third amended *qui tam* complaint filed by Relators Goan and Alexander on August 22, 2013 "alleged essentially the same allegations and actions as those alleged herein." [SAC ¶ 200]. On August 24, 2018, Defendants filed the instant motion to dismiss. [ECF No. 31]. On September 24, 2018, Plaintiffs opposed the motion to dismiss. [ECF No. 33]. Defendants filed a reply on October 15, 2018, [ECF No. 35], and a notice of supplemental authority on January 31, 2019, [ECF No. 36].

## II.   STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). While detailed factual allegations are not required, the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and it must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citations omitted). The facts alleged, taken together, must "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v.

---

[6] See Sophia Pearson, Warner Chilcott Gets U.S. Attorney Subpoena on Drug Practice, Bloomberg (Feb. 24, 2012, 8:47 AM), https://www.bloomberg.com/news/articles/2012-02-24/warner-chilcott-gets-u-s-attorney-subpoena-on-drug-sales-and-marketing.

Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570). "A claim is facially plausible if supported by 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Eldredge v. Town of Falmouth, 662 F.3d 100, 104 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

When assessing the sufficiency of a complaint, the Court first "separate[s] the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Maddox, 732 F.3d at 80 (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Next, the Court "determine[s] whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224). "[C]ourt[s] may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct," however, a claim may be dismissed. Iqbal, 556 U.S. at 679.

### III.  DISCUSSION

Defendants advance six arguments in support of their motion to dismiss: (1) that Plaintiffs' RICO claim and most of their state law claims are barred by statutes of limitation, (2) that Plaintiffs lack Article III standing, (3) that Plaintiffs fail to state a civil RICO claim, (4) that Plaintiffs have not stated a claim under consumer protection laws, (5) that Plaintiffs have not stated a claim for common law fraud, and (6) that Plaintiffs have not stated a claim for unjust

enrichment. [See ECF No. 32]. Because Plaintiffs' RICO claim is barred by the statute of limitations, the Court does not reach Defendants' other arguments. See 28 U.S.C. § 1367(c).

### A. Statute of Limitations

Defendants argue that even assuming Plaintiffs have plausibly asserted a RICO claim, that claim is barred by the four-year statute of limitations, which began to run no later than August 2013, when the *qui tam* relators' most recent complaint (which the Second Amended Complaint largely copies) was unsealed. [ECF No. 32 at 22]. Plaintiffs contend that whether their claim is time-barred by the four-year statute of limitations presents a question of fact, that the time when they should have discovered their RICO injury was delayed by Defendants' attempts to conceal their schemes, and that the statute of limitations did not begin to run until at least 2015. [ECF No. 33 at 10–16].

As a general matter in a RICO case, "the limitations period does not begin to run until [a plaintiff] ha[s] actual or inquiry notice of the injury." Koch v. Christie's Int'l PLC, 699 F.3d 141, 150–51 (2d Cir. 2012) (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998)); see also Rotella v. Wood, 528 U.S. 549, 555 (2000) ("discovery of the injury, not discovery of the other elements of a claim, is what starts the clock"). A plaintiff is on inquiry notice when there are "sufficient facts . . . available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further." McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004). "Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." Id.

Although "[d]etermining the moment at which the running of the limitations period commences . . . is normally a question for the trier of fact, . . . it may be resolved by the Court

8

. . . if the parties do not dispute the facts and only one conclusion may be drawn from them." In re Celexa & Lexapro Mktg. & Sales Practices Litig., 769 F. Supp. 2d 11, 14 (D. Mass. 2011). The First Circuit has recognized that in evaluating an affirmative defense at the pleading stage, a court may consider facts asserted by the plaintiff's complaint, "documents the authenticity of which are not disputed by the parties, . . . official public records, . . . documents central to plaintiff's claim, [and] documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993).  Here, the facts relevant to Warner Chilcott's statute of limitations defense are publicly filed lawsuits and disclosures in securities filings that provided, or should have provided, Plaintiffs with the facts necessary to bring the claims asserted here.  Thus, judicial evaluation of the statute of limitations at the pleading stage is appropriate.  See In re Celexa & Lexapro Mktg. & Sales Practices Litig., 915 F.3d 1, 15 (1st Cir. 2019) ("Celexa & Lexapro") (evaluating statute of limitations start date based on lawsuits filed by the United States and private persons).

The First Circuit's recent ruling in Celexa & Lexapro, 915 F.3d 1 (1st Cir. 2019), is instructive, particularly given the similarities between that case and the case currently before this Court.  The consumer and third-party payer plaintiffs in Celexa & Lexapro asserted RICO claims against pharmaceutical companies based on their promotion of their drugs for off-label uses.  Id. at 15.  The First Circuit explained that the statute of limitations "began to run 'at the time the plaintiff knew or should have known of his injury.'"  Id. at 14 (quoting Lares Grp., II v. Tobin, 221 F.3d 41, 44 (1st Cir. 2000)).  Because the third-party payer's economic injury occurred when it paid for fraudulently induced prescriptions, the key question was: "By what date can we say, as a matter of law, that [plaintiff] knew or should have known that [defendant] was promoting the off-label, ineffective use of [the drugs]?"  Id.  The First Circuit rejected the plaintiffs' argument

that they were not on notice of the alleged scheme until the Defendant admitted their conduct through a guilty plea. Id. at 15.  Instead, the court concluded that complaints filed by the United States and two class action lawsuits that chronicled the conduct at issue, including with specific internal communications and the names of responsible executives and physicians, were "more than sufficient to put a [third-party payer like plaintiff] on notice that [defendant] had likely been inducing off-label prescriptions . . . ." Id.

      Here, as in Celexa & Lexapro, Plaintiffs were on inquiry notice of the alleged scheme no later than August 2013.  By that date, the facts alleged in the Second Amended Complaint were publicly available through *qui tam* complaints that included allegations by three of the Defendants' former employees, who asserted substantially all the facts alleged here, including names and dates.  By March 2013, the relators' allegations and the related government investigation had been covered in press outlets including *Bloomberg* and *Law 360*, and in May 2013, Warner Chilcott acknowledged the allegations and investigation in its 10-Q filing with the SEC.  Although the Second Amended Complaint claims that "Plaintiffs had no way of knowing about the Defendants' scheme and deception," that "within the time period of any applicable statute of limitations, Plaintiff and members of the proposed class could not have discovered" the scheme, and that "Plaintiffs and the other class members did not discover" the scheme, [see SAC ¶¶ 219–222], Plaintiffs' assertion that they could not have discovered and brought their claims

earlier is not plausible,[7] given that Plaintiffs' complaints have largely copied verbatim from a *qui tam* complaint that became publicly available in 2013, [id. ¶¶ 205–09].[8]

Plaintiffs argue that in addition to not being on actual or inquiry notice, the statute of limitations should be held to have been tolled by the doctrine of fraudulent concealment. [ECF No. 33 at 16 (citing SAC ¶¶ 196–227)]. "The doctrine of fraudulent concealment tolls the statute of limitations 'where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part.'" Gonzalez v. United States, 284 F.3d 281, 292 (1st Cir. 2002) (quoting Salois v. Dime Sav. Bank of New York, FSB, 128 F.3d 20, 25 (1st Cir. 1997)). The doctrine or fraudulent concealment may toll an otherwise applicable statute of limitations "only where two conditions are met. First, the defendant raising the limitations defense must have engaged in fraud or deliberate concealment of material facts related to the wrongdoing. Second, the plaintiff must have failed to discover these facts within the normal limitations period despite his or her exercise of due diligence." Id. (citations omitted). The Second Amended Complaint contains conclusory allegations that "[a]ll applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and

---

[7] The Second Amended Complaint does not clearly assert when the injury at issue was suffered; however, the Second Amended Complaint does not allege any acts of fraud that could form the basis for a RICO claim that occurred later than 2012. Plaintiffs argue that Exhibit B to their initial complaint shows the transactions that prove injury. [ECF No. 33 at 24 ("Exhibit B to the Complaint is a 1,355 page exhibit providing over 90,000 instances where Plaintiffs' assignors paid for Warner Products.")]. As an initial matter, Exhibit B is not limited to the assignors identified by the Second Amended Complaint and, contrary to numerous assertions in the Second Amended Complaint, was not attached to it. [See ECF No 1-2]. Further, although Exhibit B to the initial complaint lists numerous transactions (perhaps thousands) that occurred as recently as 2017, Plaintiffs have not plausibly alleged that those recent transactions were the proximate result of the frauds that were committed years earlier. The Court declines to consider sales that are not remotely contemporaneous to the conduct at issue in evaluating when Defendants were injured.

[8] This is particularly true given that Plaintiffs are in the business of finding and bringing claims like those asserted here.

denial of the facts alleged herein throughout the time period relevant to this action" and that "Plaintiffs exercised reasonable due diligence in attempting to uncover the factual basis underlying the fraudulent conduct." [SAC ¶¶ 224, 227]. Plaintiffs have not, however, alleged any fraudulent acts by defendants that plausibly prevented them from learning of the allegations made by the *qui tam* relators, nor have Plaintiffs described their due diligence efforts, or explained why due diligence would not have revealed the allegations made by the *qui tam* relators.

Because Plaintiffs' RICO count is nearly entirely based on facts alleged in publicly disclosed *qui tam* complaints that were filed more than four years prior to the filing of this action, the Court concludes that the statute of limitations bars Plaintiffs from bringing a RICO claim that is a mere repackaging of those *qui tam* complaints. See Celexa & Lexapro, 915 F.3d at 15.

### B. Jurisdiction

Under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim under [the supplemental jurisdiction statute] if— . . . (3) the district court has dismissed all claims over which it has original jurisdiction." "In determining whether to retain jurisdiction on such an occasion, the court must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 48 (1st Cir. 2012). The decision "is a 'pragmatic and case-specific' one." Id. (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996)).

Here, the case is still in the early stages of litigation. The Complaint has been amended twice, but there has been no discovery. The remaining claims turn on questions of state law that have not been extensively briefed to this Court given the parties' focus on the RICO claim. Even

to the extent that the parties have indicated that the tolling rules of several states are broadly similar to the federal rule for RICO claims, those representations were made prior to the First Circuit's ruling in Celexa & Lexapro, 915 F.3d at 15.  If Plaintiffs have claims that are not time-barred, there may be close questions of state law related to the assignability of the claims at issue and the scope of state consumer protection laws.  Further, the Court likely would require further amendment of the complaint before it could resolve all of the state law claims, were it to retain jurisdiction.  The Court will therefore decline to exercise supplemental jurisdiction over the state law claims.

## IV. CONCLUSION

Accordingly, Defendants' Motion to Dismiss [ECF No. 31] is GRANTED.  The RICO claim is dismissed with prejudice.  The Court declines to exercise jurisdiction over the remaining state law claims, and they are dismissed without prejudice.  Plaintiffs may refile those claims in courts of appropriate jurisdiction.

**SO ORDERED.**

March 22, 2019                                                                    /s/ Allison D. Burroughs
                                                                                          ALLISON D. BURROUGHS
                                                                                          U.S. DISTRICT JUDGE